[Crim. No. 3892.   Second Dist., Div. Three.   Sept. 28, 1945.]

THE PEOPLE, Respondent, v. JERRY GODSEY et al., Defendants; LARRY WILLIAM GLYNN, Appellant.

A. P. Coviello for Appellant.

Robert W. Kenny, Attorney General, and Everett W. Mattoon, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—It was charged in 2 counts of an information that appellant and one Godsey committed robbery, a felony, and that they were armed with a gun at the time of the commission of the alleged offenses. Trial was by jury and appellant was found guilty as to both counts as charged in the information. Godsey was found guilty as to count 1 as charged in the information, and not guilty as to count 2. Two previous trials resulted in mistrials—the juries having failed to agree. This is an appeal from the judgment and order denying appellant's motion for a new trial.

Appellant contends that it was prejudicial error to receive certain portions of the evidence. It is therefore necessary to set forth the evidence in detail.

The two robberies were committed December 31, 1943. The first robbery, alleged in count 1, occurred at a Thrifty Drug Store which is located at 4401 West Slauson in Los Angeles. A few minutes before 9 p. m., the closing time, 2 men entered the store, went directly to the lunch counter, which is in the rear of the store, sat down at a section of the counter which extends east and west, and ordered coffee. There were 2 waitresses behind the lunch counter, and they were preparing to "check out." They were counting the money they had received that day, and were placing it on a section of the counter which extends north and south. Some of the employees had placed money, received by them during the day, on the liquor counter; and other employees were counting money on the counter in the drug department. The 2 men remained at the lunch counter until the other customers had

left the store, and the front door had been locked. They then stood up, each drew a gun, and announced that it was a "stick-up." The larger of the 2 men, identified by witnesses as Godsey, walked backward toward the front door to a place approximately in the middle of the store and, with one of the employees standing in front of him pursuant to his order, kept watch over the other employees while the smaller man proceeded to take the money from the counters and put it in his pocket. The manager of the store, who was standing by the "liquor register," went behind a partition, called the "liquor shelf," where there was a burglar alarm. The smaller man followed her. They later returned and the manager, who at the time had the key to the front door in her hand, screamed and fell upon the floor. After the smaller man had taken all the money from the counters, a total of approximately $320 in paper and silver money, and had taken a few packages of cigarettes, the larger man said, "Hurry up, Doc." They then demanded that someone unlock the front door and let them out. They questioned different employees as to the whereabouts of the key, and the employees stated they did not know where it was. A search was made for it, and one of the robbers stated in substance that someone would get "hurt" if the door was not unlocked. One of the employees saw the key in the hand of the manager, who was lying on the floor, removed it from her hand, unlocked the front door, and let the robbers out.

A "day or two" after the robbery the manager of the store, upon being shown approximately 15 photographs, identified the one of Godsey as that of one of the robbers. About 3 months after the robbery she identified both Glynn and Godsey at a police "showup" as the robbers, and she again identified them at the trial as the robbers. She testified that before the robbery she was standing by the liquor register where she had a view of the rest of the store; that she had been watching the robbers "all the while they were sitting there practically," and had just locked up approximately $2,000 in her cash box, and was going to tell the men to leave the store when they "pulled" their guns and said, "Take it easy, it is a stick up"; that Godsey had a "dark" gun, and Glynn a "silver" colored gun; that neither one appeared to be intoxicated; that Glynn followed her behind the liquor shelf and "reached there" just as she "reached for the alarm," and Glynn said, "'Oh, no you don't. Give me the money'"; that he walked toward

her and put the gun against her stomach and said, " 'Come on, give me the money' ''; that she fell to the floor where Glynn was standing and he pushed her with his foot; that she arose from the floor just before the robbers reached the front door on their way out; that she saw "Miss Noce," an employee, unlock the door and let them out; and that the witness went immediately to the telephone and called the police. She testified further that at one time during the robbery she and Glynn were about one foot apart and at that time were facing each other.

The manager's husband, who was supervisor of the lunch counter, identified Glynn and Godsey as the robbers from a group of approximately 15 men at a "police show-up" about 3 months after the robbery. He also identified them at the trial as the robbers. He testified that on the night of the robbery he went to the drugstore about 9 p. m.; that when he entered he saw the supervisor of the drug department standing behind the lunch counter, in the corner, where 2 sections of the counter meet; that he went over and spoke to him and sat down at the section of the counter which extends north and south, in which position he faced the front of the store; that he saw Glynn and Godsey sitting by the side of the counter which extends east and west, and they were 5 or 6 feet from the corner of the counter; that Glynn wore a wedding ring on the little finger of his right hand; that the witness was still sitting there at the time of the robbery; that the robbery occurred about 9:20 p. m.; that Godsey had a black or blue black Colt automatic, and Glynn had a nickel plated gun; that on their way out of the store Glynn walked backward, and "Godsey kept turning backwards and kept looking back every few seconds until he got to the door"; and that in his opinion neither one of them was intoxicated.

The supervisor of the drug department identified Glynn and Godsey at the trial as the robbers. He testified that while he stood by the lunch counter he was "right in front" of Glynn and Godsey—"about three feet away from them"; that he observed them about 2 or 3 minutes; that he was facing the front doors and, as they "were being closed the two defendants got up and said, 'this is a hold up,' and pulled out guns"; that Godsey had a black automatic, and Glynn had a nickel plated revolver; that Glynn was in his presence 15 or 20 minutes and he was about 4 feet from him; and that both men appeared to be sober.

Lena Noce, another employee, identified Glynn and Godsey at the trial as the robbers. She testified that she saw them at the lunch counter, and saw them stand up and pull out their guns; that Godsey directed her to stand in front of him; that she stood with her back toward him, and could feel his gun against her back; that he said, " 'If anyone moves somebody will get hurt' "; that she saw Glynn take the money from the lunch counter and go around the counter, but she was so "scared" she did not pay any attention to him; that she saw Glynn again when she let him out the front door; that Godsey was behind her with his gun against her back until they went to the front door; and that she unlocked the door and let them out.

The waitress, who served coffee to the robbers, testified that defendants were the men who committed the robbery.

Another employee who was present at the time of the robbery identified Glynn and Godsey at the trial as the robbers, and testified that the first time she saw Glynn he was pointing a gun at her, and it was a "light colored" gun; that he was "very close," and said he wanted the money; that "after that everybody handed out the money"; that when they were ready to leave, one of the girls was told to find the key to the front door; that Glynn looked "all over the desk" where the witness and another girl had their purses; that he opened both purses and looked inside, but he did not take anything out of the purses; that Glynn wore a wedding ring; and that in her opinion neither of the robbers was intoxicated.

At the time appellant was arrested he wore a wedding ring. During the trial Godsey wore a brown suit, and appellant wore a tan coat and trousers of a different color. Two of the above mentioned witnesss testified that the robber, identified as Godsey, wore a brown suit, and the robber, identified as appellant, wore a tan coat on the night of the robbery.

The second robbery, alleged in count 2, occurred at a gasoline service station, located at 2431 East Florence Avenue in Huntington Park, which station is about 7 miles from the drugstore above mentioned. The record does not show what time of day the robbery was committed, but the robbery was reported to the police department at 10:40 p. m. The station operator testified that 2 men drove into the station; that after he had filled the tank of their automobile with gasoline, one of the men, whom he identified at the trial as Glynn, followed him into the station and the other man remained in the auto-

mobile; that he (the witness) went behind the counter, and Glynn stopped in front of the "cash drawer"; that when the witness looked around Glynn had a gun "down the side of him," and said " 'Come on, give me that paper money' "; that Glynn pulled the witness' arm back and said he "wasn't fooling," and the witness "kicked the cash register open and gave him the money," approximately $65, which Glynn folded and put in his pocket, backed to the door, then turned around and went to the automobile. He further testified that Godsey "looks like" the man who drove the automobile, but that he was not sure it was he.

Police Officer Sund testified that when Glynn was arrested, April 29, 1944, he had a conversation with him at Central Station, at which conversation Officer Howsley was present; that the witness told Glynn that Officer Muchmore of Culver City had told him that Glynn wanted to tell him, Sund, "about the jobs that he had pulled"; that Glynn said that was right— he wanted to "clear" his mind; that Glynn told him he and Godsey committed the drugstore and service station robberies; that Glynn stated he and Godsey went in to the drugstore to get a cup of coffee, and while they were in there they made up their minds "to pull a holdup"; that after they robbed the drugstore, they drove to the service station and Godsey remained in the automobile while Glynn committed the robbery; that they then went to the hotel where Glynn was staying and divided the money, and went from there to the Friendly Tavern Cafe where they spent the evening; "that they both had been drinking over the week end, the holidays, and that they were both pretty drunk"; that Glynn said they used a stolen Chevrolet automobile in the robberies; that "after the hold up in Culver City, in which Godsey was shot, they had taken Godsey to an industrial hospital on Avalon and Slauson Avenue"; that he left Godsey there and drove the "car to 87th Street, near Broadway, and parked the car there"; that one gun was left in the automobile and the other was thrown away. The witness testified that he and Howsley questioned Godsey in the county jail and he (Godsey) stated that he "might have" committed the drugstore and service station robberies, but he had been drunk for 2 or 3 days——"so drunk he couldn't remember what he did." He testified on cross-examination, in reply to a question as to when he first knew Godsey was in custody, that he knew Godsey was in

custody "the next morning after he was shot in that hold-up." Before Glynn was arrested he saw Officer Sund in a cocktail bar and told him he had returned from Nevada because he had heard that he was accused of some robberies, and he wanted to give himself up. The officer told Glynn that he had been looking for him; however, the officer did not arrest him at that time.

Officer Howsley testified that on May 3, 1944, he told Glynn that Officer Muchmore had called him (the witness) from Culver City and stated that he had Glynn out the day before "for purposes of identification at Culver City," and that Officer Muchmore had told the witness that Glynn at the time had admitted the drugstore and service station robberies; that he asked Glynn if it was true, and Glynn said " 'yes,' that he had admitted that to Officer Muchmore"; that Glynn said he was "hooked anyway," and had "just as well start serving" his time; that Glynn wanted to know if the police could "cop out on one count," and he (the witness) told him that was up to the district attorney's office; that Glynn stated he had a revolver and Godsey an automatic, that they got "around $300" at the drugstore, that he alone held up the service station and got around $60, and that they had thrown the guns away; that he (the witness) didn't take a statement from Glynn but he thought Sund made some notes of the conversation—he saw him write in his notebook at the central jail; that he told Glynn that "after all Culver City had a job on him, and Huntington Park had a job on him, and we had one on him," and Glynn said he wanted to plead guilty to one count; that when they talked with Godsey in the county jail Officer Cox was present; that they then informed Godsey that Glynn had told them all about the drugstore robbery, and asked if it was true; that Godsey said, " 'I was so stuped up I don't know whether I did or not' "—that he was drunk and did not remember whether he went with Glynn to the service station or not—he could have; and that Godsey said he had been with Glynn on New Year's Eve.

Officer Muchmore of Culver City testified that he had a conversation with Glynn, relative to the drugstore robbery, in a police automobile on two occasions; that the first conversation occurred about May 2, 1944, when "Officer Johnson and myself picked up Glynn at the City jail, to take him out to Culver City for identification purposes," at which time he questioned Glynn regarding another matter, and then asked

him what the "L. A. police department" had on him; that Glynn said they were accusing him of "some gas station" holdup he "didn't know anything about," but that he had held up another "gas station" and also the Thrifty Drug Store, and Godsey was with him on the drugstore robbery; that about May 6, 1944, they "picked him (Glynn) up at the County jail to take him out to our Justice Court for arraignment"; that the conversation was much the same; and that Glynn said he "had lost his gun or somebody stole it at some party, and he didn't know what happened to the one Godsey had."

The People called one Voyda as a rebuttal witness, and he testified that he saw Glynn and Godsey together on January 1, 1944, "a few minutes" after 4 p. m.; that Godsey had a gun; that Godsey was shot at that time; that Glynn was present at the time Godsey was shot; and that afterwards Glynn and Godsey left the place together.

Glynn testified that he had known Godsey "a little" over 2 years; that he (Glynn) belonged to a motorcycle club; that their usual costume consisted of boots, "levys," and a leather jacket; that on December 31, 1943, attired in boots, levys, and a leather jacket, he left his hotel about 7 p. m., "had something to eat and then went over to the Friendly Tavern cafe in Huntington Park," where members of the motorcycle club were gathered; that he remained there until about midnight; that he left there once during the evening and took a girl for a ride on a motorcycle "around the block a couple of times"; that during February, 1944, a girl gave him a wedding ring; that he was wearing the wedding ring on the little finger of his left hand at the time of his arrest; that he did not think it would have gone on the little finger of his right hand at that time as he weighed about 12 pounds more then than he did at the time of the trial, and he had to "force" it on the little finger of his right hand at the time of the trial; that the coat he was wearing at the trial was the first "tan or brown" coat he had had for several years, and he had purchased it "secondhand" from a tailor shop in Huntington Park in March, 1944; that he did not tell Sund, Howsley or Muchmore he was guilty of either of the offenses charged; and that he did not take part in either robbery. He testified on cross-examination that he had been convicted of a felony, and in answer to the question "And that was attempted robbery?" replied, "Yes." Glynn was later recalled for further

cross-examination, and testified that he did not see Godsey on December 31, 1943; that he saw him on January 1, 1944, but he last saw him on that day "about 3:30 or 4:00 o'clock in the afternoon at the Yacht Club;" that he was not present at the time Godsey was shot; that the first time he saw Godsey after he was shot was in jail; and that he knew nothing about the shooting.

Glynn's brother testified that Glynn resided with him; that on December 31, 1943, he was at the Friendly Tavern Cafe; that he arrived there about 8:30 p. m., and Glynn was there when he "got there"; that he joined Glynn's group at the tavern; that so far as he knew Glynn was there "until" the witness left, which was about 9:30 p. m.; that Glynn had on "boots, levys and a leather jacket"; that he was with Glynn when he purchased the tan coat, and that was "along in March, 1944; and that on December 31, 1943, Glynn did not have a coat similar to the one he was wearing at the trial."

Godsey testified that he had known Glynn "a couple of years"; that he had worked at several places where Glynn was employed, but he was "more of a friend" of Glynn's brother; that he did not recall what happened on December 31, 1943, after 7:30 or 8 p. m.; that he went to his cousin's home that evening—he did not know what time but it was "getting dark"; that his cousin's wife was not home when he arrived, but she returned while he was there; that he had not been drinking when he arrived there, but he had "half a dozen or more" drinks there, and did not recall leaving; that the next thing he remembered he was in the General Hospital and it was New Year's Day; that he did not tell Howsley he was with Glynn on December 31, 1943, and might have participated in the robberies—that he told him he had been drinking heavily, but he "was positive or at least quite sure" that he had nothing to do with the robberies—that he thought if he had participated in the robberies he would remember it; that he remembered having breakfast "or at least eating" with a girl friend the next day; that he did not own or have access to a gun at the time he was shot; that he did not know whether he had a gun when he was shot, and as far as he knew he was alone; that he remembered when the "impact of the bullet hit" him; that he recalled "being transported," after being shot, but he did not know "whether it was an automobile or an ambulance or what"; that he wore the same suit when he was shot that he was wearing at the

trial; that he "must have" changed into the suit at his cousin's; that the suit was "in the cleaners out there," and his cousin's wife must have "got it out"; that he had on his "work clothes" when he arrived at his cousin's; that he had pleaded guilty to a felony "in this court a few weeks ago," and in reply to the deputy district attorney's question, "To what offense?" he answered, "Assault with a deadly weapon." He also testified that he was intoxicated when he arrived at his cousin's home; and on redirect examination by his counsel as to whether the plea of guilty to a felony pertained to the time he was shot, he replied that it did.

The cousin's wife testified that Godsey came to her home "about 10 minutes to 8:00 in the evening" on December 31, 1943; that she was there when he arrived; that he left about 8:45 p. m., at which time he wore a blue sweater and "dungarees"; that he was intoxicated when he arrived; and that while he was there he had "about four drinks" of whisky with her.

One Kennedy testified that he was an electrician at the shipyards; that he had known Glynn 6 or 7 years; that Glynn was a truck driver during the time he knew him; that they belonged to the same motorcycle club; that the "official dress suit" of that club included boots and a leather jacket; that the witness was at the Friendly Tavern Cafe on December 31, 1943, from 7 p. m. until 10:30 p. m.; that Glynn was also there and the witness saw him "pretty near all evening"; that he and Glynn "were playing the marble machine together" that night; that on that occasion Glynn wore "blue dungaree pants," boots, and a leather jacket; that he didn't pay any more attention to Glynn that night than he did to the other members of the club; and that he "would say" Glynn was there all the time the witness was there.

It is apparently appellant's contention that the introduction of any evidence which referred to the incident in which Godsey was shot constituted misconduct on the part of the district attorney, and that it was prejudicial error to permit its introduction. The claimed misconduct on the part of the district attorney occurred during his cross-examination of Glynn and during his direct examination of the witness Voyda. Appellant asserts that in the course of such cross-examination the deputy district attorney brought before the jury the alleged shooting of Godsey at a time subsequent to and removed from the offenses charged herein. The deputy

district attorney, as indicated above, asked Glynn whether he was present on January 1, 1944, when Godsey was shot; whether he saw Godsey after Godsey was shot; whether he took Godsey to the hospital; and whether he knew anything about the shooting. No objection was made to these questions. Later a motion to strike out this part of the cross-examination was made by defense counsel, and was denied by the court. After such ruling a motion for a mistrial made by defense counsel was also denied. In examining Voyda, the deputy district attorney asked him whether he had seen Glynn and Godsey on January 1, 1944; what time he had seen them; whether they were together when he saw them; whether Godsey had a gun at that time; whether Godsey was shot at that time; whether Glynn was present when Godsey was shot; and whether they left the place together after the shooting. Counsel for defendants objected to these questions, and made a motion for a mistrial. The objections were overruled, and the motion was denied. Appellant asserts that there was further misconduct on the part of the deputy district attorney in that at the trial he made a statement to the effect that the "only rebuttal" he had as to defendants' testimony was as to whether Glynn was with Godsey at the time Godsey was shot, and whether Godsey had a gun at the time. The district attorney was not guilty of misconduct in offering evidence to show that Glynn was with Godsey at the time Godsey was shot, since Glynn had denied being with Godsey at that time; and to show that Godsey had a gun on January 1st, since Godsey had denied having a gun. The time referred to was not remote but was within 20 hours after the robberies. The testimony of Voyda was offered for the purpose of impeaching Glynn, since Glynn had testified that he had not seen Godsey on January 1st except at the Yacht Club, and also because Godsey had testified that he had no gun on January 1st. The district attorney was careful not to bring out any testimony as to the circumstances under which Godsey was shot. In the case of *People* v. *Cabaltero,* 31 Cal.App.2d 52 [87 P.2d 364], wherein conduct of the deputy district attorney was assigned as prejudicial, the court said, at page 62, "[W]here the evidence clearly supports the conviction and *it appears that the jury in all probability would have rendered a verdict of guilty even in the absence of any dereliction on the part of the district attorney,* a reversal is not justified." (Italics added.) It is clear that robberies were

committed. The evidence was abundantly ample to prove that appellant was one of the persons who committed the robberies. He was identified a few days after the robbery by means of photographs, about 3 months after the robbery at a police show-up, and at the trial by 6 witnesses to the drugstore robbery, and at the trial by the witness to the service station robbery. Furthermore, as shown above, 3 police officers testified that appellant made admissions of his guilt as to the robberies charged herein. Although there were some inconsistencies in the testimony of the prosecution witnesses as to the time the drugstore closed on December 31, 1943, which employee locked the door, whether the burglar alarm was connected, what time the robbery occurred, how the robbers were dressed, who telephoned the police and when the police arrived, those witnesses were positive as to the identification of the defendants. ■ It was proper cross-examination to ask the defendants if they had been convicted of a felony. Both defendants having answered that question in the affirmative and having stated the nature of those offenses, it was not reversible error to receive evidence which tended to show that said felonies were committed after the crimes charged herein were committed. ■ "In order to be ground for reversal, the prosecuting attorney's conduct must have been such as to militate against justice . . . and the conduct must have occasioned injustice to the defendant. . . . The discretion of the trial court is to be considered in determining the question as to whether the prosecuting attorney overstepped the bounds of propriety; and the court's conclusion that prejudice did not result from the disputed conduct will not be set aside unless the contrary clearly is disclosed." (4 Cal.Jur. 10-Yr. Supp. 1008-9.) Even if it were to be assumed that the conduct of the deputy district attorney was improper, to justify a reversal of the judgment a review of the record must disclose a miscarriage of justice. There was no miscarriage of justice herein.

■ Appellant further asserts that the calling of the witness Voyda, who was the "victim of the alleged attempted robbery in Culver City," was "so inflammatory to the jurors' minds" as to erase any reasonable doubt they may have had up to that time. The record does not show that Voyda was the victim of the alleged attempted robbery, nor does it show that the scene of said robbery was a liquor store. Counsel

for appellant, in his brief, volunteers information to that effect. We find no basis for the charge that the calling or interrogation of Voyda constituted misconduct on the part of the prosecutor.

The judgment and the order denying the motion for a new trial are affirmed.

Desmond, P. J., and Shinn, J., concurred.