[Crim. No. 8130.   Second Dist., Div. One.   Aug. 26, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM HENRY DARNOLD et al., Defendants and Appellants.

Edward L. Lascher, under appointment by the District Court of Appeal, and Morris Lavine for Defendants and Appellants.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

WOOD, P. J.—In an indictment, six defendants (Brajevich, Darnold, Le Fave, Lenahan, Misso, and Waltreus) were accused in four counts of committing certain felonies. In count 1 they were accused of violating section 182, subdivision 1, of the Penal Code in that they conspired (1) to com-

mit an assault upon Joseph Peskin with deadly weapons, to wit, pistols and revolvers, in violation of section 245 of the Penal Code; (2) in that they conspired to place an explosive, to wit, dynamite, in and near a building with intent to injure and destroy the building in violation of section 12354 of the Health and Safety Code; and (3) in that they conspired to obtain property from Joseph Peskin by threatening him that unless he delivered the property to them they would do an unlawful injury to his person and property in violation of section 518 of the Penal Code. It was also alleged therein that the conspiracy occurred during the time from March 1 to June 30, 1958. It was also alleged that, in pursuance of the conspiracy, they committed 10 overt acts, which acts were that they talked together on certain days in April and May; Lenahan went to Peskin's home in May; Brajevich, Misso, and Darnold were near the home and garage of Peskin in May; Darnold was near the offices of the Aetna Factors Company and near a building of Sierra Steel and Fabricating Company in June; Darnold had dynamite in his possession between December 18, 1957, and June 30, 1958; and Brajevich had blasting caps and fuses in his possession on May 23, 1958.

In count 2, the defendants were accused of assault with a deadly weapon in violation of section 245 of the Penal Code, which assault was committed upon Joseph Peskin.

In count 3 they were accused of violation of section 12354 of the Health and Safety Code in that they used and placed an explosive, to wit, dynamite, in and near a building occupied by Aetna Factors Company with intent to injure and destroy the building.

In count 4 they were accused of a crime similar to the crime charged in count 3, except the building was one occupied by Sierra Steel and Fabricating Company, and the date was June 9, 1958.

Defendant Darnold admitted an allegation of the indictment that he had been convicted previously of robbery.

After the jury was sworn and before proceeding to take testimony, the motion of the prosecution to dismiss the charges against Brajevich, under section 1099 of the Penal Code, was granted and the charges were dismissed as to him.

After the prosecution had rested its case in chief, the charges against Misso were dismissed on the court's own motion.

Defendant Le Fave was found not guilty.

Defendants Darnold, Lenahan, and Waltreus were found

guilty as charged in the four counts. They were sentenced to state prison. They appeal from the judgments. Lenahan and Waltreus appeal also from the order denying a new trial.

Joseph Peskin was a principal owner of a financing business (in Beverly Hills) known as Aetna Factors Company. He was also such an owner of a manufacturing business (in Gardena) known as Sierra Steel and Fabricating Company. The factoring company had financed the California Duplicating Company about two years prior to August 1957, at which time he had meetings with defendant Le Fave and other officers of California Duplicating regarding its financial condition—they told Peskin that taxes were unpaid and they were threatened by a lien. Peskin said that his company had over $400,000 with California Duplicating, of which $120,000 was above secured accounts, and that he could not go much further. About three months later, after further negotiations, Peskin's factoring company and Le Fave's duplicating company entered into a contract whereby Peskin gave further financial assistance to Le Fave's company, took over the operation of that company, and gave Le Fave an option to reclaim the property within 30 days. After the expiration of the 30 days Le Fave and Peskin had discussions regarding the amount due to Peskin, and Le Fave said that the option would not be exercised. Le Fave signed and delivered a release to Peskin who continued to operate the duplicating business. Le Fave commenced an action against Peskin and Aetna Factors Company, based on the factoring transactions.

In April 1958, defendant Lenahan, whom Peskin had known in Chicago, came unexpectedly to Peskin's home, had dinner there, and looked at the rooms in the house. At various times during the next two weeks, Lenahan telephoned Peskin, and on one occasion asked if he could see Peskin on the night of May 14 (Wednesday). Peskin replied in the negative and stated further that usually on Wednesday nights he was away from home and returned about midnight.

About midnight on May 14, 1958, after Peskin had driven his car into his garage and turned the lights off, a man, who was wearing a mask and gloves, pointed a pistol at him through the left front window of the car, and told him not to make a sound. When Peskin tried to grab the pistol, he was hit on the head. He rolled against the steering wheel and the horn began to blow. He shouted for his wife to call the police. After the police came, he was taken to a hospital where stitches were made in his bleeding head.

There was a trail of blood from Peskin's car along the driveway to the side entrance of the residence. The police found a pair of sun glasses in a driveway of a residence which was across the alley from Peskin's residence, and they found a loaded .38-caliber revolver in the bushes by the driveway. (These articles are exhibits 16 and 18, respectively.) A .32-caliber automatic pistol and a black handkerchief were found in the bushes of an alley about a block and a half from Peskin's residence. (These articles are exhibits 19 and 21, respectively.)

In the late afternoon of May 16, after Peskin had returned home from the hospital, he received a telephone call from a person who said his name was "Williams," and that Peskin should get his lawyer and settle the *Le Fave* case immediately. The person also said that he would call again at 7 p.m. About 9 p.m. of that same day, Peskin received a telephone call from a man who gave the name "Williams" and asked if Peskin had gotten his lawyer. Peskin replied in the negative and said that the matter was for the court. The man said that Peskin was looking for trouble, that he and his family would get lots of trouble and would be taken care of unless Peskin got his lawyer and complied; and that Peskin had just had a sample. When Peskin said that he did not scare easily, the man said that he felt sorry for Peskin from then on.

On the same day, May 16, Albert Peskin, the son of Joseph, received a telephone call at the office of Aetna Factors Company from a person who said he was "Williams," that Albert had seen what happened to his father, that they wanted the *Le Fave* case settled now, that there were 18 of them from the East, and if the case is not settled the whole family would go down the drain. In another telephone call, about three minutes later from the same person, Albert was told not to call the police, that "We" mean business, and want the case settled.

On June 5, 1958, while Joseph Peskin was at the Aetna Factors Company he saw a package of dynamite between a screen door and an outside door of the building. He touched the fuse cord and found that it was cold. Both sides of the door were burned. He called the police who came and took the package of five sticks of dynamite away. The dynamite, which had a burn mark on it, was capable of being exploded. The fuse had come out of the cap and for that reason the dynamite did not explode.

On June 9, 1958, a similar package of five sticks of dyna-

mite was found on a file cabinet in an office of the Sierra Steel and Fabricating Company. The fuse appeared to have been burned. The office window had been broken, and there was a burned place on the floor about 6 feet from the window. The police removed the package. Scientific analysis indicated that the reason the dynamite had not exploded was that the fuse was old and had been wrapped tightly around the dynamite, causing the fuse to crack in several places and stop the powder train.

About two days after the dynamite was found in the steel company office, Peskin received a telephone call at his home from a person who, speaking with a little accent, said he was "Taylor," that Peskin had had two packages, and that from then on there would be five packages in the cars of Peskin and his children.

After the above-mentioned incidents, Peskin did not have any communication with any of the defendants for approximately two and one-half years, when Lenahan came to Peskin's home in the first part of 1961. On that occasion he said that Peskin was in trouble, that the boys in the Le Fave matter were pretty rough, and they were going to take care of him again. He also said that one of them was in the penitentiary, that they were waiting until he was out and they were not "kidding." He said he heard these things when he was tending bar. Peskin asked why they wanted to hurt him again. He replied that they had "muffed the job" the first time and they wanted to get even. A few days later, Lenahan went to Peskin's office and asked him to come outside and talk because he was afraid Peskin might have microphones in his office. They sat in Lenahan's car, and Peskin said that the name of the man who had telephoned him was ".'Williams." Lenahan said that was the first name of the man and that he knew his last name, that these persons were getting ready to do something against Peskin, and that he knew the three persons who were there the night Peskin was beaten.

Defendant Waltreus was a business opportunities broker in Los Angeles.

Brajevich, formerly a defendant herein, called as a witness by the prosecution, testified in substance as follows: In an afternoon in March 1958, while he and Darnold were in Waltreus' office, Waltreus said that he wanted to talk to them that evening about 6 p.m. at the Pioneer Café in El Monte. They met there at the appointed time and went into Lenahan's private office in the rear of the café where Lenahan and

Waltreus asked Darnold and Brajevich if they would take care of a certain important person, that his name would be told later, and the job would pay $12,000. Waltreus said he would get the money and it would be for Darnold, Brajevich, and Lenahan. After they accepted the proposal, several meetings of those four persons were held at various times. In May, about a week before Peskin was assaulted, a meeting was held in Lenahan's office where it was said that the person to be taken care of was Joseph Peskin, whom Lenahan had known in Chicago. Lenahan said he would get the address of Peskin. Lenahan and Waltreus said that some papers, for Peskin to sign, were being drawn up and that Darnold and Brajevich were to rough him up if it was necessary in order to get the papers signed. (The signing of the papers was intended to result in a return of Le Fave's business and in the dismissal of the lawsuit.) In a meeting held the next day, Brajevich said that he did not understand why Lenahan should get a third of the $12,000 just for finding Peskin's address. Then Waltreus said that Darnold and Brajevich would get $15,000 and that Lenahan would be paid from Waltreus' share. Thereafter, at a meeting held in Waltreus' office, he showed pictures of Peskin's home. Then the four of them went in a car and looked at Peskin's home in Beverly Hills. In a later meeting when Darnold and Brajevich said that they might need help, Waltreus and Lenahan said that was up to them but they would have to pay for it from their own share. Darnold and Brajevich made such arrangements with defendant Misso in Wilmington and agreed to pay him $5,000 of their $15,000. The day before the assault, while the four persons (not including Misso) were in Waltreus' office, Lenahan made a telephone call which indicated that he was talking to Peskin who then invited him to come to Peskin's house. Then Lenahan left the office, and the others stayed there about four hours. Lenahan returned and told them the layout of the house. The night before the assault, while the four persons were in Waltreus' office, Waltreus said that the attorney who was preparing the papers would have them ready the next day, that the papers would then be given to Darnold and Brajevich who should have Peskin call the attorney to come to his house and witness to the signing, and that the attorney would deliver a check for $105,000 to Peskin. Darnold and Brajevich said that they would ''get'' Peskin as he drove into his garage. The next day Darnold and Brajevich stated to Misso that they would assault Peskin

that night, and that Misso should meet them at Darnold's home in Whittier at 4 p.m. At 5:30 p.m., when Misso had not arrived there, they went to Waltreus' office where Darnold telephoned his home and asked his mother in-law (Mrs. Seavy) to bring Misso to a drive-in café near Waltreus' office. Waltreus gave the papers to Brajevich, and then Darnold and Brajevich went to the drive-in café where Misso joined them and they went to the vicinity of Peskin's home. Brajevich had a loaded .38-caliber revolver and sun glasses. Darnold had a loaded automatic pistol (exhibit 19) and a black handkerchief. Misso had a loaded automatic pistol (exhibit 16). Darnold and Misso stayed in the alley near Peskin's house while Brajevich parked the car about three blocks away. The three of them hid in Peskin's back yard and waited about three hours for Peskin to return. When Peskin drove into the garage, Brajevich, who was wearing a hat and a mask (black handkerchief), entered the garage, pointed his gun at Peskin and told him not to make a sound. When Peskin called for his wife, Brajevich hit him on the head with the gun. Darnold attempted to enter the garage on the right side of the car, but there was not enough space between the car and the wall. Mrs. Peskin started calling her husband, and the lights came on. Then Brajevich, Darnold, and Misso ran out of the yard, across the alley, and down the driveway of another yard. While running down the driveway, Brajevich lost his sun glasses. When Darnold was about a block and a half away from Peskin's house he threw his gun, gloves, and handkerchief away. Darnold and Brajevich returned to the car, went to Los Angeles, telephoned Waltreus, and told him there had been a mixup. Then they held a meeting with Waltreus and told him what had happened. Brajevich returned the papers to Waltreus, who said that they would meet the next day and talk about it. The next day, while meeting in Waltreus' office, Waltreus said he had explained the circumstances to Le Fave. He also said that they would make some telephone calls to Peskin and his family and try to threaten him that way and compel him to sign the papers and drop the lawsuit. The next day Darnold and Brajevich went to various places such as markets, where Brajevich made telephone calls. He, using the name ''Williams,'' telephoned Albert Peskin at Aetna Factors Company and told him that what had happened to his father was a sample of what would follow, and if he did not have his father withdraw the lawsuit and return the property to Le Fave, all his family would go down the drain. A few minutes after making that call,

Brajevich called Albert Peskin again and repeated substantially what he had just said, and stated further that there were some ''people here from the East'' and if something was not done a number of persons would be hurt. Then Brajevich, using the name ''Williams,'' telephoned Joseph Peskin and repeated the substance of what he had told Albert. Thereafter, within two days after the assault, Darnold also made some telephone calls. The following day, while Darnold, Brajevich, Waltreus, and Lenahan were having a conversation in El Monte, Darnold and Brajevich were asked if they knew something about explosives, and they replied in the affirmative. Waltreus and Lenahan said that if they threw some bombs into Peskin's businesses that might scare him into signing the papers. Darnold and Brajevich, after saying that they would try to get some hand grenades, went to Wilmington and asked Misso if he could get the grenades. A few days later, while Lenahan, Waltreus, Darnold, and Brajevich were having a conversation, Brajevich asked if dynamite would be all right. Waltreus said he did not care as long as it blew up the building. Brajevich said he would get the dynamite caps and fuse, and that Darnold would get the dynamite. Waltreus said that the Aetna Factors building would be the first one to go, and that the Sierra Steel building was the other one that had to go. Brajevich and Darnold, after observing the buildings, told Waltreus and Lenahan that they would set off the Aetna Factors explosives first, and if that did not scare Peskin into signing the papers, they would blow up the Sierra Steel building. On May 23 Brajevich got the caps and fuses. Darnold said he would get dynamite from a place in the hills near San Juan Capistrano. On May 24, after Darnold told Brajevich that he had brought 10 sticks of dynamite, they decided to put five sticks of it at each building. Brajevich told Waltreus that they were going to plant the first bomb that evening. About 11:30 p.m., of that day, Brajevich was arrested and charged, in Orange County, with unlawful possession of narcotics. After he was released on bail on June 11, he had a discussion with Darnold regarding the reason the bomb had not gone off. Later that evening, Waltreus handed five 50-dollar bills to Brajevich and said that they were to be paid on the bail bond. Waltreus also said that he had talked to Le Fave and that he had not heard anything from Peskin regarding the lawsuit. When Brajevich said that he needed money for attorney's fees, Waltreus said that they would get the money. Thereafter, Wal-

treus, Brajevich, and Le Fave had a conversation in South Pasadena at the Bahama Inn, which was owned by Le Fave. That was the first time he met Le Fave. In that conversation, Brajevich told about the assault on Peskin, and said that he did not know what actually happened regarding the bombs because he was in jail at the time the bombs were put down— that he could not say what happened, "unless Mr. Darnold messed up in fixing the fuses." When Brajevich told Le Fave that he needed money for his trial, Le Fave replied that he would get it as soon as he could. After Waltreus had left, Brajevich asked who had decided "on the $15,000." Le Fave replied that it was not $15,000 but was $50,000 that he was going to pay and that more would follow after he received his properties back from Peskin. Waltreus made no explanation regarding the $50,000 when Brajevich asked him about it. Waltreus said on several occasions that as soon as the lawsuit was settled all of them would be paid. In addition to the bail money of $250, Brajevich received $200 from Waltreus. Brajevich was convicted on the narcotics charge and was sentenced to state prison. His wife visited him in the prison in April 1960, and he told her to communicate with Waltreus, Le Fave, Darnold, and one Sliskovich.

Mrs. Brajevich, called as a witness by the prosecution, testified in substance, as follows: She learned from Darnold that her husband had had some activity relative to Peskin. She asked Darnold to help her get bail for her husband. Darnold said that some work had to be done which was supposed to have been done before, that there were two places which had to be bombed, that he and Brajevich were supposed to have done the bombings, and he had to do the bombings now in order to get the bail money. He asked her if she could get some dynamite from her father. She said she would try and do anything she could do. When she told Darnold that she could not get dynamite, he said that he was sure he could get whatever was needed. A few days before June 11, when Brajevich was released on bail, Darnold told her that the placing of the dynamite was about to take place, and on the next day, about 3 a.m., he told her that he had placed the dynamite at a building. After Brajevich was in prison, she asked Waltreus about the money that was to be paid her, and he replied the trial was still going on and there was nothing he could do, but as soon as things came through she would get some money. When she visited Brajevich in prison, he told her to give a message to Darnold. She told Darnold that

her husband said he was tired of waiting and that if his family did not receive some money within 60 days he would start talking. Darnold said that Brajevich was not that foolish. She asked Darnold to relay the message to Waltreus, Lenahan, and Le Fave. Later he told her that he had delivered the message to them. Waltreus gave her $20 on two occasions.

Mr. Bulat, a business opportunity broker, called as a witness by the prosecution, testified: He worked for Waltreus during 1958, and he knew Brajevich, Darnold, and Lenahan. In May 1958 he saw a newspaper in Waltreus' office on which there was a red pencil line next to an article about Peskin being beaten up. On another occasion in May while Brajevich and Darnold were in a private office he heard Brajevich mention the name of Peskin and said something about hitting him over the head. About that same time, when Brajevich, Lenahan, Darnold, and Waltreus were in the office, he overheard them talking about the newspaper article and saying something about the lights of Peskin's house going on and off. At the office, or in a Long Beach night club which Waltreus owned, he heard Brajevich and Darnold discussing a bombing, and saying it was very windy when they rode a motorcycle and threw a bomb through a window. Also in May when the said four persons were in Waltreus' office, he (Bulat) heard Lenahan say that on occasions he had been to Peskin's home for dinner, and he had known Peskin in Chicago. He also heard Lenahan describe Peskin's house and refer to the lights going on automatically; and he heard some discussions about money, bombs, and a document that was to be drawn up by an attorney and signed by Peskin.

Deputy Sheriff Hicks, an investigating officer herein, testified: The caps on the bombs found at the two places of business were nonelectric. Soon after the bomb was taken from the Sierra Steel building, he and other officers went with Darnold to a place in a national forest, near San Juan Capistrano, where Darnold had a mining claim. They saw a barrel in which there were 97 sticks of dynamite. A padlock on the door of the barrel appeared to have been forced open. Darnold said that it looked as if someone had broken into his magazine but it did not appear that any dynamite had been stolen. He (officer) had a conversation with Darnold regarding purchase forms for dynamite—one dated in December 1957 and the other in May 1958. One form showed that Darnold had purchased a case of dynamite, and one showed that his mother-in-law, Mrs. Seavy, had purchased

dynamite caps and fuse. Darnold said that he had purchased the dynamite for his mine, and that Mrs. Seavy had taken the caps (which were nonelectric) and the fuse to his mine. The officers searched the mine area for fuse and nonelectric caps, and went to a place where Darnold said he had buried the caps, but they did not find them.

Mr. McLin, who was engaged in the investment business, testified: About April 1958, while he was Le Fave's financial adviser, Le Fave said that he wanted to secure a loan on his bowling alley in order to pay some of his obligations. He said that Peskin had acquired control of the California Duplicating Company, and that through collusion with one of the top executives of the company, Peskin had removed Le Fave "from the picture" and he thought he should be able to regain possession of the company. A few days later, Le Fave said that Waltreus, who had been trying to find a buyer for the bowling alley, had approached Le Fave stating that he had substantial information or a "secret weapon" concerning Peskin. Le Fave said that if he could arrange for $50,-000 which would be the cost of getting the assets back, Waltreus had sufficient information on Peskin, due to Peskin's background, that he would be successful in having Peskin sign a document returning all the assets. When the newspaper article regarding the assault on Peskin appeared, Le Fave started to explain his understanding of the "secret weapon" and, in doing so, said that it was his understanding that Peskin was receiving financial assistance from the underworld, and to some extent was controlled by it, and that if Waltreus was successful in what he felt could be done, enough pressure could be put on Peskin from a financial viewpoint to compel him to return the assets, and that this is what he thought Waltreus was going to do for the $50,000. McLin said that, regardless of Le Fave's understanding with Waltreus, as far as McLin was concerned Le Fave would have to clear himself and that he should telephone Waltreus and permit McLin to listen to the conversation. Le Fave telephoned to a man who responded to the name of Waltreus, and McLin listened to the conversation wherein Le Fave said that he did not want anything to do with a secret weapon. The man said he did not want to discuss the matter by telephone. Thereafter pursuant to a request of Le Fave, McLin met him at the bowling alley where Le Fave said that he thought he was faced with trouble from two persons who were there to see him regarding money which they claimed was due them from the

assault on Peskin. Le Fave requested McLin to wait while he talked to them, and also requested him to approach the booth where they were talking if it appeared there was any serious trouble. According to McLin's recollection, one of the men was Brajevich or Misso. After the men left, Le Fave said that he thought he had satisfactorily explained to them that he was not the one who had agreed to pay them.

The three appellants testified. Each one denied that he was involved in any manner in the crimes charged. It may be stated generally that each appellant denied practically all of the material statements of the witnesses called by the prosecution. In addition thereto, Lenahan testified to the effect that on an occasion when Brajevich was in Lenahan's bar they had an argument and harsh words when Brajevich, in asking him for a loan of $100, said he would put up a suitcase full of narcotics as collateral; that he told Brajevich to get out of the bar; after Brajevich left, Lenahan gave Brajevich's automobile-license number to the police. About four weeks later, Brajevich came into the bar and said that he knew that Lenahan had "turned him in" to the police.

Le Fave, testifying in his own behalf, said: Waltreus approached him in 1958 with a proposition that for $50,000 he would effect a compromise between Le Fave and Peskin on the basis of friendship and business. Le Fave assented thereto. After the assault on Peskin, Waltreus informed Le Fave that he (Waltreus) had done what happened to Peskin in that he had hired two men from Chicago to have Peskin sign certain documents but something happened and Peskin was hit over the head. Le Fave told Waltreus that he wanted no part of such methods. Later, Waltreus told Le Fave that the men insisted on doing some bombing. Le Fave replied that he did not want to be associated with Waltreus. Thereafter, Waltreus asked Le Fave for $5,000 and said that the two men felt that they had done their part and had this amount coming. Brajevich came to Le Fave and demanded $5,000 for what he had done for Waltreus. When Le Fave refused payment, Brajevich threatened Le Fave's family if he notified the police. Later, Brajevich and one Sliskovich, in the presence of Le Fave, discussed the matter of removing safes from Le Fave's office.

In rebuttal, Officer Cook, one of the police officers who arrested Brajevich on the narcotics charge, testified that the arrest was not based on an automobile-license number; that Lenahan did not give the information that led to the arrest.

In rebuttal, Brajevich testified that he did not tell Lenahan that he knew that Lenahan had given information leading to the arrest.

Appellants contend, among other things, that the evidence was insufficient to support the verdicts and judgments. There are 13 volumes of reporter's transcript, comprising 3,452 pages. ■ A principal argument of appellants with respect to asserted insufficiency of the evidence is that the testimony of Brajevich, an accomplice, was not corroborated. Section 1111 of the Penal Code provides, in part, that the testimony of an accomplice must "be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." Rules with reference to such corroboration are stated in *People* v. *Lyons,* 50 Cal.2d 245, 257 [324 P.2d 516]; *People* v. *MacEwing,* 155 Cal.App.2d 117, 123 [317 P.2d 82]. ■ Such corroborative evidence "is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant. . . ." (*People* v. *Lyons, supra,* p. 257.) ■ The corroborating evidence "need not be direct but may be circumstantial. . . . ■ The weight of the corroborating evidence is a question of fact for the jury to determine." (*People* v. *MacEwing, supra,* p. 123.) ■ A defendant's admissions and declarations may constitute corroboration. (*People* v. *Morrow,* 127 Cal.App.2d 293, 296 [273 P.2d 696].) ■ The testimony of Mr. Bulat provided sufficient corroborating testimony with respect to all the appellants. As above stated, he heard conversations among Brajevich, Lenahan, Darnold, and Waltreus, wherein there were statements or discussions about: Lenahan's acquaintance and visits with Peskin; Lenahan's description of Peskin's house; a document that was to be signed by Peskin; getting certain things back from Peskin; bombs and money; and the newspaper article relative to the assault on Peskin.

Further corroboration of the evidence against Darnold was the testimony of Bulat that he heard conversations between Brajevich and Darnold, wherein Brajevich said something about hitting Peskin over the head, they both discussed a bombing, and Darnold said it was very windy when they threw a bomb through a window. Also further corroborating evidence against Darnold was the testimony of Officer Hicks rela-

tive to his going with Darnold to the mountain area where Darnold had dynamite stored; and the admission by Darnold that he had purchased dynamite recently.

Further corroboration of the evidence against Waltreus was the testimony of Le Fave that after the assault on Peskin, Waltreus said that he had done what happened to Peskin, that he had hired two men to have Peskin sign documents, but something happened and Peskin was hit over the head; that Waltreus said that the men insisted on doing some bombing, and Waltreus wanted $5,000 for the men. Also further corroborating evidence against Waltreus was the testimony of McLin relative to listening to the telephone conversation between Le Fave and a man purporting to be Waltreus, relative to "a secret weapon," wherein the man said he did not want to discuss the matter by telephone.

Further corroboration of the evidence against Lenahan was the testimony of Peskin that, preceding the assault, Lenahan visited him, looked at the rooms in his home, and ascertained that Peskin would return to his home about midnight of May 14; and that about midnight of that date Peskin was assaulted when he arrived in his garage. Further corroborating evidence against Lenahan was Peskin's testimony that about two and one-half years later, Lenahan said that Peskin was in trouble and that the boys in the Le Fave matter were rough and were going to take care of Peskin again; that one of them was in prison and they were waiting for him to get out; that Lenahan said that "Williams" was the first name of the man who telephoned Peskin; and also said that he knew the three persons who were there the night Peskin was beaten. In view of the corroborating evidence pertaining to all the appellants as a group, and of such evidence pertaining to them individually, it is apparent that legally there was sufficient corroboration testimony.

■ Appellants contend that the court erred in not giving an instruction that Mrs. Brajevich was an accomplice and that it was necessary that her testimony be corroborated. The court gave correct instructions defining an accomplice, and stating the necessity for corroboration of the testimony of such a person. It also gave an instruction that whether any witness was an accomplice was for the jury to determine. (There was an instruction that as a matter of law Albert Brajevich was an accomplice.) It appears from statements of the trial judge, made while discussing proposed instructions,

that he was of the opinion that it was a question of fact whether Mrs. Brajevich had the guilty knowledge and intent necessary to make her an accomplice. In *People* v. *Duncan,* 53 Cal.2d 803, 816-817 [3 Cal.Rptr. 351, 350 P.2d 103], it was said that (under the circumstances therein) "it was a question of fact whether she [Mrs. Esquivel] had the guilty knowledge and intent necessary to make her an accomplice." (See also *People* v. *Lopez,* 60 Cal.2d 223, 250 [32 Cal. Rptr. 424, 384 P.2d 16].) In the present case, due to the length of this opinion, the testimony regarding the statements and acts of Mrs. Brajevich will not be repeated here. The trial court was not required to instruct that as a matter of law Mrs. Brajevich was an accomplice.

▋ Appellants also assert that Le Fave was the principal for whose benefit the alleged acts were committed, and that since he was acquitted, the alleged aiders and abettors (appellants) were necessarily acquitted—that the verdict acquitting the principal and the verdicts convicting the aiders and abettors were inconsistent and should be set aside. Le Fave testified to the effect, as above shown, that he accepted Waltreus' proposition that for $50,000 he would effect a compromise between Le Fave and Peskin on the basis of friendship and business, that after Waltreus said he had been involved in the assault on Peskin, Le Fave denounced such methods and disassociated himself from Waltreus. A question of fact was presented as to whether Le Fave was the principal. It is implicit in the verdict of acquittal that the jury accepted Le Fave's version of the transaction and concluded that Waltreus was the instigator who persuaded the other appellants to join him in the methods used. The acquittal of Le Fave was a finding that he was not an accomplice. (See *People* v. *Lawson,* 114 Cal.App.2d 217, 220 [249 P.2d 850].) This contention is not sustainable.

▋ Appellants contend further that the court erred in not instructing the jury as to the objects of the conspiracy. In this connection they refer to the fact that appellants were indicted for conspiring to violate sections 245 and 518 of the Penal Code and section 12354 of the Health and Safety Code, and they argue that the court erred in not advising the jury regarding the provisions of those sections. Appellants argue further to the effect that mentioning the code section numbers in the instructions without specifying the provisions of the sections required the jurors to speculate as to what offenses were designated by those numbers. Correct instructions de-

fining conspiracy and various legal requirements in the prosecution of such a charge were given. An instruction stated: "[T]hus in the crime of Conspiracy, as set forth in Count I of the indictment, a necessary element is the existence in the mind of the perpetrators of the specific intent to commit any one or more of the alleged objects of the conspiracy, to wit, Assault With a Deadly Weapon, in Violation of section 245, Penal Code, use of an explosive, in Violation of section 12354, Health & Safety Code, or Extortion, in Violation of section 518, Penal Code, and, unless such intent so exists, that crime is not committed." At the beginning of the trial the indictment was read to the jury. As above shown, the indictment alleged violations of said sections and specified the respects or manner in which the violations occurred. The jury was instructed that it should determine the issues of fact presented by the indictment. The record shows that the jury was adequately informed as to the charges against the defendants.

Appellant Waltreus contends further that the court erred in not appointing counsel to represent him at the trial. His argument regarding this is to the effect that, according to his understanding, the trial judge did not appoint counsel for him for the reason he was able to provide the required bail. He does not refer to the record for the purpose of indicating a basis for his argument. He states in his brief that a friend provided bail for him. The record shows that the judge, in making comments with respect to defendant Darnold, said that if he had money for bail there might be some question about his being entitled to have counsel appointed for him, but if someone else made the arrangements for bail that would not affect the appointment. The record also shows that on an occasion prior to the trial Waltreus, in response to questions by the judge, said that he was representing himself; that he had been advised that if he did not have sufficient funds to employ counsel, he had the right to services of the public defender; he had an income and funds only to a certain extent to employ counsel for a long case like this one; that he would reserve his decision as to whether he desired to be represented by the public defender, but he felt confident that he would represent himself. Just before selecting the jury, the judge asked Waltreus if he was representing himself, and he replied in the affirmative. He did not request that counsel be appointed for him. There is no merit to this contention.

Appellants assert that the court erred in denying

pretrial discovery in connection with the statements of Brajevich. According to the minutes of the trial court, the appellants made a motion prior to trial for inspection of "witness's" statements. According to statements in appellants' brief, the appellants sought inspection of statements made by Brajevich to officers. The minutes indicate that the "motion" was in writing, but the record on appeal does not include such a document. It therefore cannot be determined from the record whether the request for inspection was a general request pertaining to all statements of all witnesses to all officers or whether it was a request pertaining to particular statements identified as having been made by certain witnesses at specified times and places. Prior to the trial, the motion regarding inspection was denied. It seems, from statements in the briefs, that the basis for the denial was that there was evidence at the hearing on the motion that there was no document in the office of the Sheriff or District Attorney of Orange County or Los Angeles County showing a statement by Brajevich. During the trial, while Waltreus was cross-examining Officer Hicks, the officer referred to a document showing statements made by Brajevich, which document had been in the office of the Sheriff of Orange County and was then in possession of Officer Hicks. Thereupon (out of the presence of the jury), the deputy district attorney said that he did not know that the officer had such a document, and that he (deputy) would suggest that the officer produce the document immediately. He also said that, at the time of the hearing on the motion, he had relied upon what the man from Orange County had said (about not having such a document). Then the judge said that, as he recalled it, the representative of Orange County had indicated there had been an examination of Brajevich, but there was no information therein as to this particular case. Thereupon, the judge ordered said district attorney to make available immediately such information as may be in possession of Officer Hicks. Later that day the deputy submitted approximately a page and a half of the document to Waltreus. The next day the deputy told the court that he had so delivered said portion, but that he saw no reason for permitting Waltreus to read the remaining portion which related to other activities of Brajevich over a period of years and had nothing to do with the case at bar. The deputy said that he would have the officer bring the remainder of the document to court. When such remainder, which consisted of many pages, was presented to the court, the defendants requested permission to see it. The court de-

nied the requests, stating that it had examined the document, at least had made a cursory examination of it, and was satisfied that the information therein did not relate to the charges in the indictment. A part of the court's explanation of such examination was that, ''as an example'' of the contents, there was an entry therein which referred to ''Next case reported'' and gave details of a matter arising in another locality. Appellants argue to the effect that they should have been permitted to inspect the document in order to be in a position to check the ruling of the court regarding the relevancy of the information, and to consider the advisability of using the information for impeachment purposes. They cite *People* v. *Cartier*, 51 Cal.2d 590 [335 P.2d 114], wherein the defendant sought inspection of police recordings of interviews with him, and it was held to be error to deny inspection. In the present case, the trial judge in ruling upon a motion for a new trial referred to the *Cartier* case and said that: ''In the present case we have an entirely different situation. This was a report . . . that . . . was the reflected and composite reporting of some four or more . . . investigators, who got together and recorded information that was furnished to them by Brajevich . . . and that the information . . . was information relating to offenses in other counties as well as in this county, which had nothing at all to do with the case, as the Court had pointed out some examples at the time. This was information collected by officers for their records, and I don't think that, in discovery proceedings, that a law-enforcement officer is required to open up his entire file . . . matters confidential and having nothing to do with the facts in the present case. Now, counsel points out that the attorneys . . . have a right to ascertain whether or not it has any bearing upon the issues in the case. Of course, . . . if it was a statement by this defendant . . . I think there would be no question of error in the Court's action. . . . [I]t is true with reference to the . . . information given by Mr. Brajevich that was compiled, that the District Attorney of Orange County came to this court and made the statement . . . that they had no statement . . . of any of the witnesses. . . . And I believe, in the 100 pages . . . at least I think it was stipulated that it was over 20, but I think it was at least close to 50, that there was . . . approximately a one and a half page reference to this particular case that we are talking about. And it may be that the witness' statement could very conceivably have permitted him to have a misrecollection as to the content of all that

material, because it was of such minute detail, within the information that they had collected."

In *People* v. *Burch,* 196 Cal.App.2d 754 [17 Cal.Rptr. 102], wherein the defendant sought an order for production of a notebook used by an officer in his investigation of the case, the prosecution delivered one of the pages of the book. It was said therein (p. 763): "Appellant shows no abuse of the trial court's discretion. The court examined the whole book and found nothing in it except the one page which applied to the case. The court expressly stated: '[T]here's nothing that refers to your client in that book except what you saw, and everything else applies to some other case. . . .' "

In the present case the court did not err with respect to not allowing inspection of the remainder of the document. Appellants were not prejudiced by the failure to produce the page and a half of the document prior to the commencement of the trial.

Appellants also contend that the court erred in ruling that the deputy district attorney acted in good faith in asking certain questions on cross-examination of character witnesses who were called by appellant Waltreus. The witnesses had testified on direct examination regarding Waltreus' general reputation for peace and quiet, truth, and honesty. On cross-examination, the deputy district attorney asked whether the witnesses had heard that: Waltreus had been convicted of conspiracy to commit grand theft and attempted grand theft; he had procured others to beat his former business associate; he had procured the burning of his escrow company by others; he had advised a person to burglarize the home of Peskin in Palm Springs; he had employed others to burglarize the office of an attorney. Defendants' objections to the questions were overruled. During the questioning of the last of those witnesses, it was ascertained that the offense of conspiracy to commit grand theft and attempted grand theft was subsequent to the offense charged in this indictment. Thereupon, the court instructed the jury to disregard questions and answers relative to the subsequent offense of conspiracy. Even though the jury was so instructed, such testimony was admissible with respect to the traits of truth and honesty, since Waltreus was a witness. (See *People* v. *Bastian,* 95 Cal.App. 249 [272 P. 756]; *People* v. *Godsey,* 71 Cal.App.2d 82, 93 [162 P.2d 46]. Waltreus challenged the good faith of the deputy in asking the questions. In a hearing out of the presence of the jury relative to good

faith, the deputy stated his source of information. As to the conviction of conspiracy, the source was a deputy district attorney. As to the assault on a business associate, the source was Brajevich who said that he and Darnold did it. As to burning the escrow company, the sources were Brajevich and Bulat. As to the burglaries at Peskin's house and the attorney's office, the source was Brajevich. During the hearing, the judge observed that the deputy was making a statement as an officer of the court. The court ruled that the deputy acted in good faith in asking the questions. Appellants cite *People v. Perez*, 58 Cal.2d 229, 241 [23 Cal.Rptr. 569, 373 P.2d 617], which is to the effect that counsel, on cross-examination, should not assert facts not in evidence which are detrimental to a defendant when no proof thereof is available. The present case is distinguishable therefrom in that the deputy established to the satisfaction of the court that he acted in good faith relying upon information obtained by investigation. The deputy was not required, as contended by appellants, to testify at said hearing. (See *People v. Cooley*, 211 Cal.App.2d 173, 214 [27 Cal.Rptr. 543].) The court did not err in ruling that the deputy acted in good faith.

Appellants contend further that section 12354 of the Health and Safety Code, as applied in this case, where no definition of an "explosive" was given in an instruction, is unconstitutional. That section provides that: "Every person is guilty of a felony . . . who, . . . maliciously uses . . . explodes, or attempts to explode any explosive at . . . any (a) building. . . ." The indictment herein stated that the explosive used was dynamite. The word "explosive" is a commonplace word and it was not necessary to define it in an instruction. This contention is not sustainable.

Appellants also assert that the court erred in receiving the testimony regarding telephone calls to the Peskins in that the testimony was hearsay. When objections to the testimony were made on the ground of hearsay, the objections were overruled subject to presenting prima facie evidence of a conspiracy. Later, after testimony had been received regarding a conspiracy, Brajevich testified to the effect that pursuant to direction by Waltreus that threatening calls be made, he telephoned the Peskins and made statements similar to the statements which the Peskins testified were made. He also testified that Darnold made telephone calls. Under the circumstances herein it could reasonably be inferred that the calls

were made by or on behalf of appellants. The court did not err in receiving the testimony.

A further contention of appellants is that the dep-, uty district attorney was guilty of misconduct in that his expressions of personal belief regarding appellants' guilt were improper. The court instructed the jury that statements of counsel could not be considered as evidence. The deputy made a similar statement at the beginning of his argument to the jury. After discussing the evidence, and while concluding his opening argument, he said that if the jurors viewed the testimony as he thought it reasonably appeared, he thought that they would find the defendants guilty. In concluding his closing argument, he asked the jurors to apply the law to the facts which they considered credible, and he was sure they would arrive at the proper verdict. The deputy was not guilty of misconduct.

Appellants' other contentions, including matters relating to instructions and rulings as to admissibility of evidence, need not be discussed in detail. These contentions are not sustainable.

The evidence was sufficient to support the judgments. The defendants were accorded a fair trial.

Lenahan's notice of appeal from the order denying his motion for a new trial was filed prior to the 1961 amendment of section 1237 of the Penal Code which provides that such an order is not appealable. Waltreus' notice of appeal from the order denying his motion for a new trial was filed after the amendment; and such order is not appealable.

The judgments (as to all appellants) are affirmed. The order denying Lenahan's motion for a new trial is affirmed. Waltreus' attempted appeal from the order denying his motion for a new trial is dismissed.

Fourt, J., and Lillie, J., concurred.

Petitions for a rehearing were denied September 20, 1963, and appellants' petitions for a hearing by the Supreme Court were denied October 23, 1963.