[Crim. No. 16724. In Bank. Dec. 3, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD DAVID GORDON, Defendant and Appellant.

[redacted]

## COUNSEL

Norman W. de Carteret, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Howard J. Schwab, Norman H. Sokolow and Lawrence P. Scherb II, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—Defendant Richard David Gordon appeals from a conviction of murder in the second degree. (Pen. Code, §§ 187, 189.) Defendant principally contends the trial court committed prejudicial error in failing to instruct the jury on the law pertinent to the testimony of an accomplice. We conclude the error was not prejudicial and the judgment must therefore be affirmed.

Defendant and Carolyn Thorin[1] were charged by information with the murder of Carl Pieper on February 21, 1970. Defendant was also charged with the burglary of Carl's residence. At their first trial on these charges, Carolyn was acquitted but defendant was convicted of both first degree murder and burglary. His conviction was subsequently reversed by the Court of Appeal. (*People* v. *Gordon,* 2 Crim. 19548, unpublished opn.) At defendant's second trial, he was acquitted of the burglary charge and found guilty of second degree murder.

We briefly summarize the evidence introduced at the second trial. Carolyn and Carl were planning to be married in Las Vegas on Saturday evening, February 21, 1970. Defendant Gordon had also been courting Carolyn; the weekend before the planned marriage, defendant and Carolyn travelled to Texas where they stayed together in a motel. Carolyn described her relationship with defendant as "platonic."

According to Carolyn's testimony, in the early morning on February 21, defendant broke into Carl's house in Los Angeles, came to the doorway of the bedroom where Carolyn and Carl were in bed together, and fired a gun at them. A struggle between defendant and Carl ensued during which Carl was shot to death. Defendant then beat Carolyn over the head with his gun.

Carolyn further testified defendant forced her at gunpoint to leave with him in Carl's car. The pair drove to Malibu where they stopped at a restaurant and a liquor store, then checked into a motel on the beach. At the motel she convinced defendant to give her his gun and told him she would drive him to the airport to catch a flight to New York. Before they left the motel Carolyn went outside and buried the gun in the sand underneath the building. She was observed doing so by James D. Miller, an off-duty California highway patrolman, who was playing volleyball with a group of people on the beach adjacent to the motel. Carolyn made no attempt to signal any of these persons for help. Thereafter, she drove defendant to the Los Angeles International Airport where he boarded a flight to New York.

After leaving defendant at the airport, Carolyn drove to her mother's house in Redondo Beach and telephoned the police and her attorney. She told the police of the day's events and took them to the places she had been with defendant. She also informed the police of defendant's whereabouts. He was arrested as he stepped off the plane in New York.

---

[1]Carolyn Thorin remarried after the events involved herein and is identified in the trial transcript as Carolyn Simpson.

Carl's tenant, who lived in an apartment over the garage in back of the main house, testified the floodlight over the back of the house had been turned off on the evening before Carl's murder. She stated Carl always had the light on at night because he feared burglars. Lights in the den and living room which were normally operated at night by automatic timers were also extinguished the evening before the shooting. In addition, the tenant testified the screen was off the kitchen window when she returned home that evening. The taxi driver who drove defendant to the neighborhood of Carl's house testified defendant arrived there around 5:30 or 6 o'clock in the morning.

Glen Varner, a Los Angeles police officer, testified defendant made three statements to the police, each depicting a different version of Carl's death. The first of these statements was consistent with the testimony given at the trial by Carolyn and tended to corroborate her version of events.[2] The prosecution also presented physical evidence taken at the scene of the killing from which the jury reasonably could have inferred that defendant shot Carl.

In his own behalf, defendant testified it was Carolyn alone who had done the shooting. He maintained that he and Carolyn planned to be married, that Carolyn devised a plan to convince Carl they were having an affair and that as a result Carl would terminate his relationship with Carolyn. According to defendant, Carolyn wanted to "let Carl down easy" because he had given her money. Defendant testified he was admitted to Carl's house through the front door by Carolyn, who then called Carl into the living room. After a brief conversation, the three went into the bedroom

---

[2]In his second conversation with the police, defendant changed his story and told the officers that his first version of Carl's death was untrue. According to defendant, he and Carolyn together had planned that defendant would go to Carl's house in the early morning, would enter through the back door left open by Carolyn, and would create a scene so that Carl would terminate his engagement to Carolyn. When defendant confronted Carl in the bedroom and said he had been invited by Carolyn, Carl pulled a gun from the dresser adjacent to the bed and beat Carolyn over the head. A struggle between defendant and Carl followed during which Carolyn grabbed the gun and fired at Carl. Defendant also fired the gun at Carl. According to defendant, he knew the bullet he fired was the one that killed Carl because he had shot him in the head.

In the third version of the incident given to the police, defendant stated that Carl had already been shot by the time he arrived at the house. In both the second and third versions defendant stated that he agreed to take the blame for the shooting in order to protect Carolyn and to further this end he arranged the house to appear as if a burglary had occurred.

At the first trial, defendant also testified it was he who shot Carl. In his testimony in the second trial, defendant explained these prior statements by stating that he was attempting to clear Carolyn of the charges brought against her.

where Carl and Carolyn began to argue and Carl drew a gun from a dresser drawer. Carl threatened both defendant and Carolyn with the gun and then pistol-whipped Carolyn over the head. Defendant and Carl struggled and the gun was knocked to the floor. According to defendant, Carolyn picked up the gun and shot and killed Carl. Thereafter, defendant agreed to assume blame for the killing and arranged the house to appear as if he had broken in through the back window in the course of a burglary. Defendant testified further that during their stay at the motel in Malibu, he and Carolyn devised the plan for defendant to leave for New York and Carolyn to phone the police from her mother's house.

Defendant contends his conviction should be reversed because of the trial court's failure to instruct the jury *sua sponte* on the definition of accomplice and the rules applying to accomplice testimony. In *People* v. *Bevins* (1960) 54 Cal.2d 71, 76 [4 Cal.Rptr. 504, 351 P.2d 776], quoting from *People* v. *Warren* (1940) 16 Cal.2d 103, 118 [104 P.2d 1024], we held it is the duty of the trial court in a criminal case to give, on its own motion, instructions on the pertinent principles of law regarding accomplice testimony " '. . . whenever the testimony given upon the trial is sufficient to warrant the conclusion upon the part of the jury that a witness implicating a defendant was an accomplice . . . .' "[3] Defendant argues the evidence was sufficient to allow the jury to conclude Carolyn was such a witness.

Penal Code section 1111 defines an accomplice as "one who is *liable to prosecution* for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (Italics added.)[4] ▮ In order to be included within this definition, the witness must have "guilty knowledge and intent with regard to the commission of

---

[3]The appropriate instructions, whether the witness is found to be an accomplice by the court as a matter of law or found to be such by the jury as a factual issue, are (1) that the testimony of the accomplice witness is to be viewed with distrust (*People* v. *Miller* (1960) 185 Cal.App.2d 59, 82 [8 Cal.Rptr. 91]; see also CALJIC No. 3.18), and (2) that the defendant cannot be convicted on the basis of the accomplice's testimony unless it is corroborated by such other evidence as shall connect the defendant with the commission of the offense (Pen. Code, § 1111; see also CALJIC No. 3.11).

[4]Penal Code section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

Defendant does not contend that Carolyn's testimony, if believed, is not sufficiently corroborated to support the conviction.

the crime." (*People* v. *Duncan* (1960) 53 Cal.2d 803, 816 [3 Cal.Rptr. 351, 350 P.2d 103].) As in the instant case, where the facts are in dispute as to the knowledge and intent of the asserted accomplice, the witness' liability for prosecution is a question of fact for the jury. ■ That the witness was prosecuted for the same offense as defendant does not alone establish her to be an accomplice. (*People* v. *Williams* (1970) 10 Cal.App. 3d 638, 641 [89 Cal.Rptr. 143].)

The People contend (1) there is not sufficient evidence to support a determination that Carolyn possessed the requisite knowledge and intent with regard to Carl's death and (2) Carolyn was not an accomplice under section 1111 in any event as she was not liable to prosecution for Carl's death at the time she testified against defendant because of her acquittal at the first trial. Neither of these contentions has merit.

The evidence is clearly sufficient to warrant the conclusion by a properly instructed jury that, prior to her acquittal at the first trial, Carolyn was liable to prosecution for Carl's murder. In his opening statement, the prosecuting attorney indicated to the jury that he personally believed Carolyn was "involved" in the killing and stated: "I think that when you finally hear all the evidence and think about it a little bit, that you will conclude that this was a single murder with two people who did it, and one of them is sitting here [referring to defendant]." Although the prosecution's argument is not evidence in the case (*People* v. *Stoll* (1904) 143 Cal. 689, 693 [77 P. 818]), it indicates that the People believed the case contained evidence of Carolyn's criminal liability for Carl's death and that they tried the case on that theory. Furthermore, defendant's own testimony, which was not inherently improbable, added evidence that reasonably could support a jury finding Carolyn was involved in the crime, and thus warranted a conclusion by the jury that Carolyn was an accomplice under section 1111.

As noted above, Carl's tenant testified that the lights in Carl's house, which were always left on at night, had been turned off the night before his murder and the screen had been removed from the rear window. The evidence also indicated that Carolyn and Carl were the only persons in the house during the evening before Carl's death. It was undisputed that defendant and Carolyn had travelled and stayed together on at least two occasions shortly before Carl's death. Carolyn's son testified he did not know of any plan of Carolyn's to marry Carl on Saturday, February 21, 1970, even though he had seen her in Texas when she was with defendant on the previous weekend and was on his way to visit Carolyn on the date of Carl's death. In addition, the prosecution presented the testimony of

Scott Flohr, a friend of defendant, to the effect that on the day prior to Carl's death, defendant himself had planned to marry Carolyn. It is also undisputed that Carolyn failed to solicit aid in escaping from defendant, who was supposedly forcing her to accompany him, when assistance was readily available to her near the motel in Malibu at the time she buried the gun.

█ Contrary to the People's contention, the fact there was no direct evidence that Carolyn aided and abetted Carl's murder under Penal Code section 31[5] or that there was a conspiracy between Carolyn and defendant to murder Carl, does not preclude a finding that she was an accomplice under section 1111. Section 1111 defines an accomplice merely as "one who is liable to prosecution for the identical offense charged against the defendant." There is no provision limiting the application of this section to aiders and abettors or coconspirators, to the exclusion of perpetrators. █ Thus, "An accomplice includes all persons concerned in the commission of the offense, whether they directly commit the act constituting the offense or aid and abet in its commission." (*People* v. *Scofield* (1971) 17 Cal.App.3d 1018, 1026 [95 Cal.Rptr. 405].)

Defendant's testimony, coupled with other evidence pointing to Carolyn's involvement in Carl's death, was sufficient to warrant a conclusion by the jury that Carolyn was liable to prosecution for the homicide because she directly committed the act constituting the offense. In *People* v. *Wallin* (1948) 32 Cal.2d 803, 808 [197 P.2d 734], we stated that "The statutory requirement of corroboration is based primarily upon the fact that experience has shown that the evidence of an accomplice should be viewed with care, caution and suspicion because it comes from a tainted source and is often given in the hope or expectation of leniency or immunity." It follows that where the evidence indicates that the crime may have been committed by either the witness or the defendant, but not necessarily by both, the witness' testimony incriminating the defendant is no less tainted and subject to suspicion than the testimony of a suspected aider and abettor or coconspirator. In such a case, the motivation to fabricate is based upon the hope or expectation not merely of leniency or an offer of immunity, but of complete freedom from criminal liability in the event of the defendant's conviction. █ Thus, under both the express

---

[5]Penal Code section 31 provides in part: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . are principals in any crime so committed."

language and the purpose of section 1111, the jury could reasonably have found from the evidence that Carolyn was an accomplice, whether they believed, as defendant testified, she was solely responsible for the murder, or, as the prosecuting attorney stated, both defendant and Carolyn were "involved" in Carl's murder. The trial court's failure to instruct *sua sponte* upon the definition of an accomplice and the utilization of accomplice testimony, therefore, was error. (*People* v. *Bevins* (1960) *supra,* 54 Cal. 2d 71, 76.)

In support of their second contention, regarding the effect of Carolyn's prior acquittal, the People rely upon *People* v. *Darnold* (1963) 219 Cal. App.2d 561, 578 [33 Cal.Rptr. 369]; *People* v. *Goldstein* (1955) 136 Cal. App.2d 778, 789 [289 P.2d 581]; and *People* v. *Lawson* (1952) 114 Cal. App.2d 217, 220 [249 P.2d 850], each of which held in part that an acquitted codefendant is not an accomplice within the meaning of section 1111. ▆▆ The People argue that because Carolyn had been acquitted on the first trial she was no longer "liable to prosecution" for Carl's murder at the time she testified against defendant in the second trial and thus was not an accomplice. In *People* v. *Wallin* (1948) *supra,* 32 Cal.2d 803, 808, however, we clearly held "The test is not whether she [the alleged accomplice] was subject to trial and conviction *at the time she testified,* but whether, *at the time the acts were committed,* and as a result of those acts, she became 'liable to prosecution for the identical offense charged against the defendant.' " (Italics in original.) Therefore, Carolyn's previous acquittal did not prevent the jury from finding her to be an accomplice for the purpose of evaluating her testimony under section 1111.

The fact the accomplice witness in *Wallin* had been previously convicted, whereas in this case Carolyn had been acquitted, does not affect the applicability of the holding in *Wallin*. ▆▆ As noted above, we explained in *Wallin* that the requirement of corroboration is based on the notion that the evidence of an accomplice should be viewed with suspicion because it is often "given in the hope or expectation of leniency or immunity." (P. 808.) Carolyn's motivation to fabricate her testimony in the instant case may have been no less substantial. When she testified in her own behalf in the first trial, her testimony was clearly to be distrusted under the rationale set forth in *Wallin*. Were she to change her testimony in the second trial, she would be subject to prosecution for perjury as a result of her conflicting testimony under oath. (Pen. Code, § 118.) Additionally, we believe any person acquitted of murder would have some reluctance, whether from societal pressure or otherwise, to subsequently admit he or she in fact committed the offense. Indeed, such reluctance could be virtu-

ally as pervasive as the hope or expectation of leniency relied upon in *Wallin*. Therefore, because compelling reasons exist for discounting Carolyn's testimony at defendant's second trial, the jury should have been instructed that her testimony was to be viewed with distrust and that they could not find defendant guilty on the basis of Carolyn's testimony unless sufficient corroboration has been established. (See fn. 3, *ante*.)

We note further that the cases relied upon by the People, although somewhat broad in their language, are not necessarily inconsistent with the rule pronounced in *Wallin*. In each of these cases a codefendant witness was found not to be an accomplice by virtue of an acquittal by the same trier of fact who convicted the person implicated by the alleged accomplice. As pointed out in *People* v. *Darnold* (1963) *supra*, 219 Cal.App.2d 561, 578, implicit in such an acquittal is a finding by the trier of fact that the codefendant witness was not an accomplice, i.e., that the acquitted codefendant did not possess guilty knowledge and intent with regard to the crime with which he and his convicted codefendant were charged. The result reached in these cases is, therefore, consistent with the holding of *Wallin* that the issue of complicity is to be determined as of the time the crime was committed.

We conclude, therefore, that the court erred in neglecting to instruct the jury *sua sponte* on the law of accomplices. The question remains whether the failure to so instruct resulted in a miscarriage of justice requiring a reversal. (Cal. Const., art. VI, § 13.) It is well established that " 'a "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People* v. *Bevins* (1960) *supra*, 54 Cal.2d 71, 78, quoting from *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; see also *People* v. *Newman* (1971) 5 Cal.3d 48, 54 [95 Cal.Rptr. 12, 484 P.2d 1356].)

No cases have held failure to instruct on the law of accomplices to be reversible error per se. The leading authority, *People* v. *Warren* (1940) *supra*, 16 Cal.2d 103, 118-119, describes our duty in this manner: "whenever the testimony given upon the trial is sufficient to warrant the conclusion upon the part of the jury that a witness implicating a defendant was an accomplice, it is the duty of the trial court to instruct the jury upon the law as set forth in section 1111 of the Penal Code; that the failure of the trial court to so instruct the jury under such circumstances, with or without a specific request for such instructions, constitutes error; but that in the event of such failure in any case, the entire record must be consid-

ered in determining whether such error constituted prejudicial error requiring a reversal of the judgment of conviction." We therefore examine the record to ascertain whether the error here compels reversal.

A rule is only as important as the reason for its adoption. As we have emphasized above, the rule requires the testimony of an accomplice to be viewed with care, caution and suspicion for the reason that its very source is tainted. (*People* v. *Bowley* (1963) 59 Cal.2d 855, 858 [31 Cal.Rptr. 471, 382 P.2d 591, 96 A.L.R.2d 1178]; *People* v. *Wallin* (1948) *supra,* 32 Cal.2d 803, 808; *People* v. *Coffey* (1911) 161 Cal. 433, 438 [119 P. 901].) Some opinions have used the phrase "viewed with distrust" (*People* v. *Terry* (1970) 2 Cal.3d 362, 398 [85 Cal.Rptr. 409, 466 P.2d 961]), but none has expressed the reason for the care, caution, suspicion or distrust in terms other than the possible taint adhering to the explanations of an accomplice. The jury is to be admonished so that it will not accept the words of an accomplice at face value, with any presumption of truthfulness and candor, or upon the same standard as that applied to other witnesses. (*People* v. *Dail* (1943) 22 Cal.2d 642, 653 [140 P.2d 828].) The jurors must be warned that, in effect, the accomplice may tailor the truth to his or her own self-serving mold, and that they are to weigh the testimony with that caveat in mind.

Ordinarily the court's admonition to the jury comes at the end of the trial as one of numerous other instructions on applicable law. There is always the possibility that its significance may thereby be diluted or its relationship to specific testimony obscured. ■ In sharp contrast, here the jury was warned at the very beginning of the trial to view Carolyn's testimony with suspicion and distrust; and the warning was delivered not by the court but by the very prosecutor who was to produce her as a witness. Indeed he gave more than mere cautionary advice; he emphasized that "She's not going to tell you the truth." Thus not at the conclusion of the trial, not after the witness might have made a favorable impression, but before she was placed on the stand, the jury was advised that Carolyn was not to be trusted.[6] In that manner the reason for the rule on admonition was adequately satisfied. The court not only could not have done more at the conclusion of the trial, but its usual instruction on the subject would

---

[6]A close reading of the prosecutor's remarks could support an argument that only the portion of Carolyn's testimony relating to her own complicity was discredited. However, we believe the thrust of the prosecutor's unusual statement, combined with the considerable evidence presented connecting Carolyn with the incidents in question, were sufficient to cast significant doubt upon all of Carolyn's testimony in the eyes of the jury and to eliminate any prejudicial effect the omission of the cautionary instruction otherwise may have had.

have been less unequivocal and to some extent anticlimactic. While the jurors might overlook a single instruction among dozens of others given by the court, they could not have missed the prosecutor's dramatic threshold message on the subject of Carolyn's veracity.

We turn to the transcript to quote the relevant portion of the prosecutor's opening statement: "And when these events occurred, there were three people in the house. There was a lady named Carolyn Thorin, who you will find out was a former defendant in this case. There was a man named Gordon, who is the defendant who sits here. And there was Carl Pieper, who is deceased and, of course, will not be called as a witness. Three people. [¶] The case began with two of those three people as defendants. One of them dead. We now have one of them still as a defendant. The other one is dead and the other one will eventually be called as a witness. . . . [¶] Now, I have been talking about independent witnesses and the trial of these two. And I have also talked about this case being unusual. It is going to be unusual because the People's star witness—I suppose if it is going to be written up in a newspaper article—would be Carolyn Thorin, because she is going to testify that she was in the house. She was in bed with Carl Pieper. This man, Mr. Gordon, came in, apparently through the window. He came into their bedroom and fired shots. He ultimately killed Carl Pieper. That is going to be her testimony. [¶] What I'm going to suggest to you is that she is going to go on and testify to other things. And what I am going to suggest to you, and perhaps this makes the case unusual, is that she's not going to tell you the truth. I think you will conclude, from all the evidence, that there was more than one person involved here. And the other person is Carolyn Thorin. . . . [¶] I think you will conclude when you see all the evidence and when you hear the people testify as to what went on outside of this house that you are getting a half-truth story from Mrs. Thorin. And I say half-truth, because I think the other evidence will indicate that Mr. Gordon here was probably in fact the man who pulled the trigger and did the killing. . . . [¶] And I think that when you finally hear all the evidence and think about it a little bit, that you will conclude that this was a single murder with two people who did it, and one of them is sitting here. And it is your job to decide whether he is guilty or innocent of these charges."

Because the prosecutor advised the jurors that Carolyn is "not going to tell you the truth" and that they will be "getting a half-truth story" from her, and because of Carolyn's inherently suspect posture in this case, as shown by the evidence, we cannot conclude on the basis of the record as a whole that it is reasonably probable the jury would have reached a re-

sult more favorable to the defendant had the correct cautionary instruction been given.

Corroboration, furthermore, is no problem here. That there was adequate corroboration of the testimony of the accomplice, as required by Penal Code section 1111, is uncontested by the defendant and is abundantly clear. The corroborative evidence is by no means inherently incredible, and there is no basis in the record to speculate that the jury may have rejected it. Certainly such speculation could not support a conclusion that if an instruction on corroboration had been given, a verdict of acquittal would have been. "reasonably probable" within the *Watson* rule.

■ Defendant also contends he was denied a fair trial because of knowing use of perjured testimony by the state. In support of this contention, defendant relies solely on the above-discussed opening statement by the prosecutor, in which the latter told the jury that defendant's trial would be unusual in that the state's "star witness" would not be telling the whole truth. The prosecutor expressed his belief that Carolyn and defendant were both responsible for Carl's death and that much of Carolyn's testimony would be untrue. He stated further, however, that, "I think the evidence will indicate that Mr. Gordon here was probably in fact the man who pulled the trigger and did the killing."

In *In re Imbler* (1963) 60 Cal.2d 554, 560 [35 Cal.Rptr. 293, 387 P.2d 6], we stated: "A judgment of conviction based on testimony known by representatives of the state to be perjured deprives the defendant of due process of law [citations]. In making such an attack, however, petitioner must establish by a preponderance of the evidence that perjured testimony was adduced at his trial, that representatives of the state knew that it was perjured [citations], and that such testimony may have affected the outcome of the trial [citations]." In *In re Mitchell* (1950) 35 Cal.2d 849, 856 [221 P.2d 689], we stated that "The petitioner must show by a preponderance of substantial, credible evidence that perjured testimony was knowingly presented by the prosecution [citation] and that such testimony established an essential element of her conviction. [Citations.]"[7] Defendant has not met this burden.

---

[7]As exemplified by *Imbler* and *Mitchell* the question of the state's knowing use of perjured testimony to secure a conviction normally arises in habeas corpus proceedings rather than on appeal. Where the alleged perjury appears from the record on appeal, however, we see no reason why the test applied in a habeas corpus proceeding should not be used to determine on appeal whether there has been a denial of due process.

In his statement the prosecutor made it clear that Carolyn's credibility as a witness was suspect. In effect, he was presenting her testimony with a full admonition of its doubtful veracity, so that the jury could decide for itself which of the conflicting versions of the incidents in question was true. The prosecutor, despite his suspicions, did not *know* Carolyn's testimony was perjured; indeed, as we have suggested, his warnings to the jury concerning her truthfulness were most unusual. Moreover, defendant makes no showing that any of Carolyn's testimony was in fact perjured. The remarks of the prosecutor are not evidence in this regard. (*People* v. *Stoll* (1904) *supra,* 143 Cal. 689, 693.) Finally, it is significant that Carolyn was the only person other than defendant who knew what actually occurred. The parties to litigation generally cannot choose all their witnesses; some are forced upon them by circumstance.[8] We conclude, therefore, the prosecution's presentation of Carolyn's testimony did not constitute a denial of due process. (*In re Mitchell* (1950) *supra,* 35 Cal.2d 849, 856.)

 Defendant next argues the trial court erred in failing to instruct the jury on the law of involuntary manslaughter. The record, however, contains no credible evidence which would support defendant's belated claim that the killing was accidental.

Defendant advances other assertions relating to the competence of his counsel, the sufficiency of the evidence, and the conduct of the trial judge. We have examined these contentions and conclude they are without merit and require no further discussion.

The judgment is affirmed.

Wright, C. J., McComb, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

**CLARK, J.**—While I concur in affirming the judgment, I cannot agree the trial court was compelled to instruct the jury on accomplice testimony. (See *ante,* p. 466, fn. 3.)

Section 1111 of the Penal Code defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant

---

[8]Reflecting the policy that "a party does not necessarily have free choice of witnesses but must take those who know the facts, and therefore cannot 'vouch' for them" (Witkin, Cal. Evidence (2d ed. 1966) §§ 1270-1271, pp. 1176-1177), Evidence Code section 785 now allows the credibility of a witness to be attacked by any party, including the party calling him. (See also Law Revision Commission comment to § 785.)

on trial in the cause in which the testimony of the accomplice is given." When she testified at defendant's second trial, Carolyn Thorin could not have been his accomplice within the meaning of section 1111 because, having been acquitted of the charge at the first trial, she was no longer liable to prosecution for the murder charged against defendant. This interpretation of the statute is consistent with the rationale of the rule requiring corroboration of accomplice testimony—"the fear that an accomplice may be motivated to falsify his testimony in the hope of securing leniency for himself." (*People* v. *Bowley* (1963) 59 Cal.2d 855, 857 [31 Cal.Rptr. 471, 382 P.2d 591, 96 A.L.R.2d 1178].) Since Carolyn Thorin was no longer subject to prosecution, she was no longer in need of leniency.

*People* v. *Wallin* (1948) 32 Cal.2d 803 [197 P.2d 734] is distinguishable. The accomplice in *Wallin* had been *convicted* in the earlier proceeding and therefore was possibly motivated to testify falsely in hope of gaining favorable post-conviction treatment.

The possibility Carolyn Thorin testified falsely against defendant to avoid disgrace or prosecution for perjury probably furnished a ground for impeachment[1] but failed to give rise to a *sua sponte* duty to instruct the jury her testimony required corroboration.

---

[1]Section 780, subdivision (f), of the Evidence Code provides: "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to . . . [t]he existence or nonexistence of a bias, interest, or other motive."

CALJIC No. 2.20, which catalogues the matters affecting credibility set forth in sections 780 and 788 of the Evidence Code, was given on the court's own motion.