Opinion
 

 ASHBY, J.
 

 After a jury trial appellant was convicted of first degree murder and was sentenced to state prison.
 

 Sixteen-year-old Richard Burton lived with his mother in an apartment on Lubec Street in Bell Gardens. They kept a .22 caliber revolver
 
 *879
 
 with a six-inch barrel and wooden handle in the house, underneath his mother’s bed. Richard was acquainted with appellant, who was 18. On the evening of April 26, 1976, Richard showed the gun to appellant.
 

 About 5 p.m. the following day, April 27, Richard and his friend, Rocky Catón, the victim, were at Richard’s apartment. Appellant and John Vega, who was 15, were at the front door. When Richard answered the door, appellant asked for the gun. Richard replied that he did not have one. Appellant forced his way through the door and went inside. Richard fell to the couch and Rocky ran to the kitchen. Appellant told Vega to go to the kitchen and bring Rocky back into the living room, which he did. Appellant had a box cutter, a device with a razor blade, in his hand. Appellant held the box cutter over Richard and said he would cut Richard’s throat if he did not tell where the gun was. Richard told appellant the gun was under the bed mattress in the master bedroom. Appellant sent Vega to the bedroom and Vega returned with the gun.
 

 Appellant said, “Where is the gun?” Vega replied, “I have it; let’s go.” Appellant demanded to see the gun and Vega gave it to him. Appellant told Richard and Rocky to go into the bedroom and open a window. Appellant said that they should tell a stoiy that some Mexican with long brown hair and a mustache came in and that they had seen him get away in a red, candy-apple Chevy. Richard said he would tell the story. Rocky also said he would tell the story. Appellant knocked Rocky to the bed and said, “You better.”
 

 They all returned to the living room. Appellant laid Richard down on the couch and started to tape his hands with some nearby packing tape. Appellant kept breaking the tape and finally told Vega to tape Richard. Vega said, “We’ve got the gun, let’s go,” but appellant said, “Just tape him.” Appellant then instructed Vega to tape Rocky. Rocky was sitting on the couch and said, “Please don’t... tape me.”
 

 With the gun in his right hand, appellant brought the gun down from his own head level, extended his arm, pointed the gun at Rocky’s head and shot him. Richard observed Rocky’s head drop down and blood splattered at Richard’s feet. Rocky died of the gunshot wound to the head.
 

 Richard buried his head in the couch and said, “You shot him.” Appellant slapped Rocky and said, “Wake up,” but Rocky did not react. Appellant said to Richard, “Shut up before I shoot you.” Richard shut
 
 *880
 
 up. Vega said, “Don’t shoot him. You already shot one. You have got the gun. Let’s go.” Appellant said, “I better shoot him because he will tell.” Richard said that he wouldn’t tell. Appellant repeated the direction to tell the story about the Mexican, and appellant and Vega left.
 

 Richard inferred that appellant was under the influence of a drug because appellant was mumbling and asked Richard if he wanted any “reds.”
 

 Frank Escalante, age 16, lived in Bell Gardens and knew appellant. He saw appellant in front of Escalante’s house twice on April 27. The second time was about an hour after the first, when it was almost dark outside. Vega had just left appellant’s company when Escalante saw him the second time. Appellant ran up to Escalante, grabbed him by the shirt, and said, “I shot him—I shot a boy. But I didn’t mean to. He just kept on fucking with me and fucking with me.” Appellant showed Escalante a revolver with a six-inch barrel which he took out of the back of his pants. Escalante told appellant to give him the gun but appellant would not. Escalante drove appellant to Salt Lake Park in Huntington Park and told him to throw the gun away. When Escalante dropped appellant off at the park, appellant said thanks and took off.
 

 Appellant sometimes lived with his brother David in Bell Gardens and sometimes with his mother in Huntington Park. After talking to Richard, Officer Gardner, who was familiar with appellant, and Officer Apodaca went to Huntington Park to look for appellant. When the officers arrived in their unmarked vehicle at appellant’s mother’s house, Gardner observed appellant in the driveway* got out, pointed his revolver at appellant and said, “Police officers, Rocky, hold it. Put your hands up and spread your legs.” Instead of complying, appellant ran away. He attempted to climb over a wall but failed. He ran toward the doorway and when it appeared that he might be reaching for a weapon Officer Apodaca shot him. The door came open and appellant fell inside, to the floor of his own living room. The officers and appellant’s mother, sister, and stepfather came into the living room. Appellant looked up and said, “Tell them I have been with you all afternoon. I have been here with you all afternoon. I haven’t done nothing wrong.”
 

 Appellant and his mother testified to an alibi defense. Appellant denied that he went to Richard’s house on the 27th. Appellant was at his brother’s until 11:30 a.m., at his sister’s until 1 p.m., and at his mother’s
 
 *881
 
 in Huntington Park until 7 p.m. Appellant took eight reds right after 1 p.m. when he left his sister’s, and he was under the influence. He made a short trip from his mother’s to a store and drank two beers. He was going to make another trip to the store when he saw Officer Gardner. He had had unpleasant relations with Officer Gardner before, and he ran because he thought Gardner w.as going to kill him. He did not tell Frank Escalante that he shot a kid.
 

 Contentions
 

 Appellant contends (1) that the court should have instructed that the testimony of an accomplice" should be viewed with distrust; (2) that the court’s instructions relating to diminished capacity and intoxication were inadequate; (3) that the court erred in instructing on premeditated first degree murder because there was insufficient evidence to support such an instruction; and (4) that the court made inadequate inquiries of appellant as to the reasons for appellant’s expressed dissatisfaction with his counsel, and should have advised appellant of the right to self-representation.
 

 Accomplice Instructions
 

 John Vega testified as a prosecution witness. The trial court instructed the juiy that Vega was an accomplice as a matter of law, that the testimony of an accomplice must be corroborated, and on the sufficiency of evidence to corroborate an accomplice.
 

 Appellant complains that the court also should have instructed that the testimony of an accomplice should be viewed with distrust.
 
 (People
 
 v.
 
 Cuellar,
 
 262 Cal.App.2d 766, 770 [68 Cal.Rptr. 846].) Assuming this was error, it does not warrant reversal because it is not reasonably probable a result more favorable to appellant would have been reached had such instruction been given.
 
 (People
 
 v.
 
 Gordon,
 
 10 Cal.3d 460, 470-473 [110 Cal.Rptr. 906, 516 P.2d 298].) All the essential elements of the crime were provided in detail by the testimony of Richard Burton. The other highly incriminating evidence in the case also came from witnesses other than Vega: Appellant’s admission to Frank Escalante that he had shot someone and his showing of the murder weapon to Escalante; appellant’s flight from the police; and appellant’s attempt upon apprehension to tell his mother to give him an alibi. Vega’s testimony merely corroborated an already strong case.
 

 
 *882
 
 Furthermore, this is not a case where the court failed to give
 
 any
 
 instructions on “the law of accomplices”
 
 (e.g., People
 
 v.
 
 Benjamin,
 
 40 Cal.App.3d 1035, 1043 [115 Cal.Rptr. 668], cited by appellant). The court did instruct that “[a] conviction can not be had upon the testimony of an accomplice unless it is corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense.” Thus the jury was in fact informed that the testimony of an accomplice is not accepted “at face value . . . upon the same standard as that applied to other witnesses.”
 
 (People
 
 v.
 
 Gordon, supra,
 
 10 Cal.3d at p. 471.) Failure to give an additional instruction on viewing such testimony with distrust was clearly harmless.
 
 (Id.,
 
 at pp. 471-472.)
 

 Instructions on Diminished Capacity and Intoxication
 

 Richard Burton, John Vega, appellant, and appellants mother all testified that appellant was under the influence of drugs. Appellant also mentioned he had drunk two 16-ounce beers. Appellant contends the court inadequately instructed the jury on drug intoxication and diminished capacity as it affected appellant’s specific intent to commit the. underlying felonies of burglary and robbeiy necessaiy to sustain a finding of first degree murder on a felony-murder theory. The instructions appellant now claims should have been given were not requested by appellant in the trial court. Analysis of appellant’s contentions shows that the court adequately instructed the jury on the subject and that this case involves the principle that, “[w]here instructions are correct so far as they go and the only objection is they are inadequate by reason of generality, indefiniteness, or incompleteness it is necessary the defendant request amplification of the instructions in the court below to preserve his claim of error on appeal.”
 
 (People
 
 v.
 
 James,
 
 274 Cal.App.2d 608, 611 [79 Cal.Rptr. 182];
 
 People
 
 v.
 
 Starkey,
 
 234 Cal.App.2d 822, 829 [44 Cal.Rptr. 738];
 
 People
 
 v.
 
 Anderson,
 
 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366].)
 

 The juiy was instructed in the language of CALJIC No. 8.21 that, “The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a result of the commission of or attempt to commit the crime of either robbeiy or burglary, and where there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the first degree. [¶] The specific intent to commit robbeiy or burglary and the commission or attempt to commit such crime must be proved beyond a reasonable doubt.” The juiy was also informed of the specific intent necessary in robbery and burglary. The
 
 *883
 
 court instructed the jury to consider the manner in which diminished capacity affected the specific mental states that are essential elements of murder, voluntary manslaughter, burglary or robbery, by giving a modified version of CALJIC No. 8.77 (1976 Revision).
 
 [1]
 
 Without modification, that instruction relates diminished capacity to the mental states essential to murder and voluntary manslaughter. The court added the words “burglary or robbery” at the end of the first paragraph and then added an additional paragraph at the end, stating, “Further, if you find that the defendant’s diminished capacity was such that you have a reasonable doubt as to whether or not the defendant could form a specific intent as would be required to commit either the offenses of burglary or robbery, then you must find that he did not have such specific intent to commit such crimes.”
 

 Appellant contends that the court should have added an express statement that if appellant did not have the specific intent to commit burglary or robbery, then the jury could not find him guilty of first
 
 *884
 
 degree murder under the felony-murder doctrine. Contrary to appellant’s contention, the conclusion that appellant could not be guilty of first degree felony murder if he lacked the specific intent to commit burglary or robbery, was apparent to the jury from the instructions given. The jury knew from CALJIC No. 8.21 and the other instructions, that the commission of robbery or burglary with specific intent was necessary to sustain a first degree finding under the felony-murder doctrine.
 

 Appellant next conténds that where voluntary intoxication is relevant to specific intent the court should give CALJIC No. 4.21, but, as discussed above, the court gave adequate instructions on diminished capacity, and CALJIC No. 4.21 would have been redundant in the circumstances.
 
 [2]
 

 Finally, appellant contends the court should have made more clear that the word “intoxication” can refer to drug intoxication as well as alcohol intoxication. (See
 
 People
 
 v.
 
 Fanning, 265
 
 Cal.App.2d 729, 733 [71 Cal.Rptr. 641].) Appellant asserts that without such guidance the jury might assume that intoxication refers only to alcohol, and might misdirect attention to appellant’s two beers rather than'his eight reds. We do not agree with the assertion that a jury would assume intoxication is limited to alcohol intoxication. Contrary to appellant’s contention, that word does not have a “technical meaning peculiar to the law”
 
 (People
 
 v.
 
 Earnest,
 
 53 Cal.App.3d 734, 744 [126 Cal.Rptr. 107]) but is instead a term “commonly understood by those familiar with the English language” which does not require amplification in the absence of the request therefor.
 
 (People
 
 v.
 
 Anderson, supra,
 
 64 Cal.2d 633, 639.) Furthermore, the diminished capacity instructions given by the court refer to “substantially reduced mental capacity, whether caused by mental illness, mental defect, intoxication,
 
 or any other
 
 cause. ...” (Italics added.) The jury was adequately instructed on all aspects of appellánt’s diminished capacity defense.
 

 
 *885
 
 Instruction on Premeditated Murder
 

 The trial court instructed the jury on first degree deliberate and premeditated murder, as well as first degree felony murder. Conceding that a first degree verdict would be justified by the evidence on a felony-murder theory, appellant contends there was insufficient evidence to justify instructing the jury on premeditated murder, and that since there is no way of knowing whether the jurors may have relied on the allegedly erroneous premeditation theory, the first degree verdict cannot stand. This contention is without merit because the evidence justifies a finding of deliberate and premeditated murder.
 

 In
 
 People
 
 v.
 
 Anderson,
 
 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942], the court stated: “The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did
 
 prior
 
 to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as ‘planning’ activity; (2) facts about the defendant’s
 
 prior
 
 relationship and/or conduct with the victim from which the jury could reasonably infer a ‘motive’ to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of ‘a pre-existing reflection’ and ‘careful thought and weighing of considerations’ rather than ‘mere unconsidered or rash impulse hastily executed’. . .; (3) facts about the nature of the killing from which the juiy could infer that the
 
 manner
 
 of killing was so particular and exacting that the defendant must have intentionally killed according to a ‘preconceived design’ to take his victim’s life in a particular way for a ‘reason’ which the jury can reasonably infer from facts of type (1) or (2).” (Italics in original; citation omitted.)
 

 Appellant erroneously contends there is no evidence in this case to fit any of the three categories. The evidence here satisfies the criteria in categories (2) and (3).
 

 There was strong evidence of appellant’s relationship with the victim prior to the shooting from which the jury could reasonably infer a motive to kill the victim. Rocky Catón was a witness to appellant’s crimes against Richard Burton. As appellant argues, there is no indication that appellant knew Rocky Catón or expected to find him at Richard’s house
 
 *886
 
 when appellant went there to take Richard’s gun away. Appellant might have thought that Richard alone could be intimidated not to report appellant, but had no way of knowing whether Rocky could be trusted to keep quiet. The jury could infer that appellant had already formulated the intent to use force or homicide to insure Rocky’s silence, from the incident in the bedroom when appellant knocked Rocky to the bed and said, “You better” tell the story about the Mexican in the red Chevy. Later, in the living room, Rocky exhibited less than complete cooperation with appellant when he begged not to be taped up. Shooting Rocky at that point could reasonably be treated as the culmination of appellant’s preexisting intent to kill Rocky if necessary to silence him.
 

 Appellant argues this theory is unreasonable because appellant did not kill Richard also. Appellant could well have thought that killing Richard was unnecessary because he would be sufficiently intimidated by appellant’s prior threats and the killing of Rocky. Richard told appellant he would cooperate. Alternatively appellant might have been suddenly filled with fear, guilt or remorse which prevented him from killing Richard also. This does not detract from the deliberation and premeditation of the murder of Rocky.
 

 With respect to category (3), the jury could infer from the manner of the killing that appellant must have intentionally killed according to a preconceived design to take his victim’s life in a particular way for a reason which the jury could reasonably infer from category (2). When Rocky refused to cooperate in being taped, appellant brought the pistol down from his head, extended his arm, pointed the pistol directly at Rocky’s head and fired. In light of appellant’s motive, the- method of carrying out the execution showed a deliberate intent to kill rather than an indiscriminate explosion of violence.
 
 {People
 
 v.
 
 Anderson, supra,
 
 70 Cal.2d at pp. 27-28.)
 

 Appellant argues it could be inferred the killing was unintentional because appellant slapped Rocky and said, “Wake up,” and because appellant told Frank Escalante that he “didn’t mean to.” The slapping could be treated by the juiy as an attempt by appellant to make sure Rocky was dead. The jury was not required to accept appellant’s self-serving statements made after the crime was committed.
 

 The court properly instructed the juiy on premeditated murder.
 

 
 *887
 
 Advice Regarding Self-Representation
 

 After the voir dire and swearing in of the jury, appellant moved to dismiss his court-appointed counsel:
 

 “The Defendant: I want to dismiss him off the case. I don’t think he knows what the hell he is doing. It is my life in jeopardy and I want somebody that I can trust. The Court: What makes you think he doesn’t know what he is doing? The Defendant: I just don’t think he knows what he is doing. And it’s my life. Let me run it, okay? The Court: That man seated next to you is one of the most competent defense lawyers I ever saw in my life. The Defendant: Well, he sure don’t seem like it, picking a jury like that. The Court: You don’t know anything about how a jury is supposed to be selected. The Defendant: Look, let me run my own life, okay. The Court: Your request is denied, sir. That is to your own benefit. This is— The Defendant: Hey, what the hell are you doing, denying it? It’s my God damn life. The Court: I recognize that. Mr. Campbell, remove him. The Court is in recess until 9:00 tomorrow morning. The Defendant: Get your hands off me, man. Don’t put your hands on me. Don’t put your fucking hands on me. Get your hands off me, man. (At 3:35 p.m. an adjournment was taken until Friday, August 27, 1976 at 9:00 a.m.)”
 

 Citing
 
 People
 
 v.
 
 Marsden,
 
 2 Cal.3d 118, 123-124 [84 Cal.Rptr. 156, 465 P.2d 44], appellant argues the court did not adequately inquire as to appellant’s reasons for dissatisfaction with his counsel. This contention is without merit. Unlike
 
 Marsden,
 
 here the court specifically asked appellant to explain the reason for Jiis dissatisfaction, and the only reason appellant gave was that appellant did not think the attorney “knows what ... he is doing. .. . [¶].. . picking a juiy like that.” The court considered and evaluated appellant’s complaint, which did not depend upon matters outside the record. The trial judge observed the jury voir dire himself.
 
 (Id.)
 
 There was adequate inquiry into appellant’s reasons and the trial court was well within its discretion in concluding appellant had made no showing justifying discharge of his court-appointed counsel.
 
 (People
 
 v.
 
 Carr,
 
 8 Cal.3d 287, 299 [104 Cal.Rptr. 705, 502 P.2d 513];
 
 People
 
 v.
 
 Green,
 
 15 Cal.App.3d 524, 527-528 [93 Cal.Rptr. 84].)
 

 Appellant next contends “that his strenuous protestations against continued representation by his appointed attorney, coupled with his insistence that he should be permitted to run his own life, should have alerted the court to the possibility that appellant would have preferred to
 
 *888
 
 represent himself rather than rely upon an attorney he could not trust. Under these circumstances, the court should have informed, appellant that he had the constitutional right to represent himself. See
 
 Faretta
 
 v.
 
 California,
 
 422 U.S. 806 (1975) [45 L.Ed.2d 562, 95 S.Ct. 2525].” This contention is likewise without merit.
 

 A similar contention was rejected in
 
 People
 
 v.
 
 Enciso,
 
 25 Cal.App.3d 49, 55-57 [101 CaI.Rptr. 590]. The court stated: “Although the authorities hold that the right to defend one’s self and the right to be represented by counsel if such representation is desired, are fundamental, primary and constitutional rights, our research has revealed no case in which an issue relating to the duty of a trial court to “warn’ a defendant in a criminal case of his right to self-representation has been raised. However, in all cases dealing with the right of a defendant to act as his own counsel, the court’s denial or granting of such right seems to arise as the result of some kind of request initiated by the defendant on the trial level, and discussion thereof is always in terms of such a request. Thus, the implication is strong that if a defendant wishes to act as his own counsel it is incumbent upon him to initiate a request therefor, and not upon the court initially to advise him of that right.”
 

 The court further suggested that requiring such advice would be unwise because it might suggest to the average defendant that he probably could represent himself and had no necessity for a lawyer.
 
 {Id.,
 
 at p. 57.)
 

 Although
 
 Enciso
 
 was decided prior to
 
 Faretta
 
 v.
 
 California, supra,
 
 subsequent authorities show that its reasoning is sound and fully applicable here.
 

 Unlike the right to the
 
 assistance
 
 of counsel, the right to dispense with such assistance and to represent oneself is guaranteed not because it is essential to a fair trial but because the defendant has a personal right to be a fool. This right is afforded the defendant
 
 despite
 
 the fact that its exercise will almost surely result in detriment to both the defendant and the administration of justice.
 
 (People
 
 v.
 
 McDaniel,
 
 16 Cal.3d 156, 164-166 [127 CaI.Rptr. 467, 545 P.2d 843].) It would be fundamentally unwise to impose a requirement that the court advise or suggest to a defendant this procedure which is likely to be to no one’s benefit.
 

 It is still the law, as discussed in
 
 Enciso,
 
 that the right to self-representation must be initiated by a timely and
 
 unequivocal
 
 assertion by
 
 *889
 
 the defendant. (See
 
 Faretta
 
 v.
 
 California, supra,
 
 422 U.S. at p. 835 [45 L.Ed.2d at pp. 581-582];
 
 People
 
 v.
 
 Windham,
 
 19 Cal.3d 121, 127-128 [137 Cal.Rptr. 8, 560 P.2d 1187].) Although appellant made remarks about running his own life, he never indicated that he wanted to represent himself at trial. That he merely wanted the appointment of some other attorney was clearly implied by his statement, “It is my life in jeopardy and
 
 I want somebody
 
 that I can trust.” (Italics added.) Appellant’s statements did not require the trial court to inquire whether appellant might not prefer to represent himself. The converse of this situation was presented in
 
 People v. Wright
 
 72 Cal,App.3d 328, 338 [140 Cal.Rptr. 98], where the defendant requested and was granted the right to self-representation. He argued on appeal that when he requested self-representation “the trial court has a duty and obligation to inquire of defendant whether defendant wouldn’t prefer the appointment of a substitute counsel rather than self-representation.” That argument was rejected. We hold the trial court in this case properly and adequately inquired of appellant and was not required to initiate any advice concerning the right to self-representation.
 

 The judgment is affirmed.
 

 Kaus, P. J., and Stephens, J., concurred.
 

 Appellant’s petition for a hearing by the Supreme Court was denied January 5, 1978.
 

 [1]
 

 The instruction given by the court read: “If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, mental defect, intoxication, or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant’s ability to form any of the specific mental states that are essential elements of murder and voluntary manslaughter, burglary or robbery. “Thus, if you find that the defendant’s mental capacity was diminished to the extent that you have a reasonable doubt whether he did, maturely and meaningfully, premeditate, deliberate, and reflect upon the gravity of his contemplated act, or form an intent to kill, you cannot find him guilty of a willful, deliberate and premeditated murder of the first degree. “Also, if you find that the defendant’s mental capacity was diminished to the extent that you have a reasonable doubt whether he was able to form the mental states constituting either express or implied malice aforethought, you cannot find him guilty of murder of either the first or second degree. “[If you have a reasonable doubt [1] whether he was able to form an intention unlawfully to kill a human being, or [2] whether he was aware of the duty'imposed on him not to commit acts which involve the risk of grave injury or death, or [3] whether he did act despite that awareness, you cannot find that he harbored express malice.] “[Further, if you have a reasonable doubt [1] whether his acts were done for a base, anti-social purpose, or [2] whether he was aware of the duty imposed on him not to commit acts which involve the risk of grave injury or death, or [3] whether he did act despite that awareness, you cannot find that he harbored implied malice.] “Furthermore, if you find that as a result of mental illness, mental defect, or intoxication, his mental capacity was diminished to the extent that he neither harbored malice aforethought nor had an intent to kill at the time the alleged crime was committed, you cannot find him guilty of either murder or voluntary manslaughter. “Further, if you find that the defendant’s diminished capacity was such that you have a reasonable doubt as to whether or not the defendant could form a specific intent as would be required to commit either the offenses of burglaiy or robbery, then you must find that he did not have such specific intent to commit such crimes.”
 

 [2]
 

 CALJIC No. 4.21 reads: “In the crime of.......of which the defendant is accused [in Count......of the information], a necessary element is the existence in the mind of the defendant of the specific intent to.................... “If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if defendant had such specific intent. “If from all the evidence you have a reasonable doubt whether defendant was capable of forming such specific intent, you
 
 must give the
 
 defendant the benefit of that doubt and find that he did not have such specific intent.”